Martin H. Myers (SBN 130218)
Email: mmyers @cov.com
Jeffrey A. Kiburtz (SBN 228127)
Email: jkiburtz@cov.com
Rebecca A. Jacobs (SBN 294430)
Email: rjacobs@cov.com
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

Attorneys for Plaintiff
THE WALT DISNEY COMPANY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE WALT DISNEY COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>AIG SPECIALTY INSURANCE COMPANY f/k/a CHARTIS SPECIALTY INSURANCE COMPANY,<br><br>    Defendant. | Civil Case No.:<br><br>**DECLARATION OF MARTIN H. MYERS IN SUPPORT OF PLAINTIFF THE WALT DISNEY COMPANY'S MOTION TO COMPEL ARBITRATION** |

I, Martin H. Myers, declare and state as follows:

1.      I am a partner at the law firm of Covington & Burling LLP, and am lead counsel for Plaintiff The Walt Disney Company ("TWDC") in the above-captioned suit.  I have personal knowledge of the matters stated herein and, if called upon, could competently testify thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of "Digital Technology & Professional Liability Insurance" Policy No. G21654115 006, effective May 1, 2012, to May 1, 2013, issued by Illinois Union Insurance Company.  This policy will be referred to as the "Primary Policy."

3.      Attached hereto as **Exhibit 2** is a true and correct copy of "Excess Edge" Policy No. 01-855-73-58, effective May 1, 2012, to May 1, 2013, issued by Defendant Chartis Specialty Insurance Company ("AIG") to TWDC as the "Named Insured."  This policy will be referred to as the "Excess Policy."

4.      TWDC sought insurance coverage under the Primary Policy, the Excess Policy and other insurance policies in the same insurance program for an underlying lawsuit filed against one of its subsidiaries and other insureds.

5.      I was personally involved in discussions with AIG and the other insurers that participated in the insurance program containing the Primary Policy and Excess Policy.  After the underlying lawsuit was resolved by settlement, all of the insurers in the same program—except AIG and one of its affiliates—agreed to contribute in full to the settlement.  AIG declined to contribute and denied coverage.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of the relevant, public portions of a letter dated June 22, 2017, that I received from AIG's attorney, Michael J. Bowe of Kasowitz Benson & Torres LLP**.**

7.      Attached hereto as **Exhibit 4** is a true and correct copy of the relevant, public portions of a letter dated June 28, 2017, that Rukesh Korde of Covington & Burling LLP sent to Mr. Bowe.

8.      No mediators were proposed or selected and no dates or locations for mediation were discussed relating to AIG's proposal to mediate.  A mediation provider was not selected.  Mediation briefs were not submitted or exchanged, and the parties did not attend a mediation conference.  TWDC did not agree to mediation.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of the relevant, public portions of a letter dated July 7, 2017, that I received from AIG's counsel, Alexander B. Simkin of Kasowitz Benson & Torres LLP.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of the relevant, public portions of a letter dated September 1, 2017, that I sent to Mr. Bowe.

11.     On September 1, 2017, TWDC submitted a Demand for Arbitration against AIG with the Los Angeles office of JAMS.

12.     Attached hereto as **Exhibit 7** is a true and correct copy of the relevant, public portions of a letter dated September 12, 2017, that I received from Mr. Bowe.

13.     Attached hereto as **Exhibit 8** is a true and correct copy of the relevant, public portions of a letter dated September 25, 2017, that I sent to Mr. Bowe.

14.     During various conversations that I had with Messrs. Bowe and Simkin in September and October 2017, both over the phone and in person, counsel consistently expressed a willingness to use JAMS and to have the arbitration proceed under the JAMS Rules.  They never proposed that the parties use another arbitration provider or other rules.

15.     Attached hereto as **Exhibit 9** is a true and correct copy of a letter dated October 6, 2017, from Jeffrey A. Kiburtz of Covington & Burling LLP to the case administrator at JAMS who had been assigned to TWDC's arbitration demand.

16.     Attached hereto as **Exhibit 10** is a true and correct copy of the relevant, public portions of email correspondence between Mr. Bowe and me dated October 6, 2017.

DECLARATION OF MARTIN H. MYERS IN SUPPORT OF PLAINTIFF THE WALT DISNEY COMPANY'S MOTION TO COMPEL ARBITRATION

17.     Attached hereto as **Exhibit 11** is a true and correct copy of the relevant, public portions of a letter dated October 9, 2017, with attachments, from Mr. Bowe to the case administrator at JAMS LA.

18.     Attached hereto as **Exhibit 12** is a true and correct copy of an email dated October 13, 2017, from the case administrator at JAMS LA to the parties.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 17th day of October, 2017, in San Francisco, California.

By:  _/s/  Martin H. Myers_
Martin H. Myers
Attorneys for Plaintiff

DECLARATION OF MARTIN H. MYERS IN SUPPORT OF PLAINTIFF THE WALT DISNEY COMPANY'S MOTION TO COMPEL ARBITRATION

# EXHIBIT 1

 **Illinois Union Insurance Company**

# ACE DigiTech®
# Digital Technology & Professional
# Liability Insurance Policy
### Declarations

**This Policy is issued by the stock insurance company listed above.**

**THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY.  EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, AND WHICH ARE THE RESULT OF WRONGFUL ACTS COMMITTED AFTER THE RETROACTIVE DATE BUT BEFORE THE END OF THE POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIMS EXPENSES.  FURTHER NOTE THAT AMOUNTS INCURRED FOR DAMAGES AND CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING.  PLEASE REFER TO SECTION II, DEFINITIONS.**

| | |
|---|---|
| **Policy** No. G21654115 006 | |

**Item 1. Named Insured:**  **The Walt Disney Company**
Principal Address:  500 S. Buena Vista Boulevard
Burbank, CA 91521

**Item 2. Policy Period:**
From 12:01 a.m. 05/01/2012        To 12:01 a.m.  05/01/2013
(Local time at the address shown in Item 1)

**Item 3.** Insuring Agreement(s) Purchased (☒):

☒ A.  Technology and **Internet** Errors and Omissions Liability
☒ B.  **Media Activities** Liability
☒ C.  **Network Security** Liability
☒ D.  Privacy Liability
☒ E.  Data Breach Fund

**Item 4.** Limit of Liability (including **Claims Expenses**):

A.  Limit of Liability for Insuring Agreement(s) Purchased:

| | Each **Claim** | Aggregate |
|---|---|---|
| A.  Technology and **Internet** Errors and Omissions Liability | $15,000,000 | $15,000,000 |
| B.  **Media Activities** Liability | $15,000,000 | $15,000,000 |
| C.  **Network Security** Liability | $15,000,000 | $15,000,000 |
| D.  Privacy Liability | $15,000,000 | $15,000,000 |
| E.  Data Breach Fund | $10,000,000 | $10,000,000 |
| B.  **Regulatory Proceeding** Sub-Limit of Liability | $10,000,000 | $10,000,000 |
| C.  Maximum **Policy** Aggregate Limit of Liability: | | $15,000,000 |

| Item 5. | Retention: | |
|---|---|---|
| | $10,000,000 | each **Claim** for Coverages A, B, C, and D |
| | $ 5,000,000 | each **Claim** for Coverage E |
| | $20,000,000 | each **Claim** for Injunctive Relief (to the extent such coverage is provided in c.a) and c.b) of the definition of **Damages**) |

**Item 6.** Notice to **Insurer**:

      A.      Notice of **Claim** or **Wrongful Act**

            Director of Claims
            ACE Professional Risk
            P.O. Box 5105
            Scranton, PA 18505-0518

            e-mail: ProfessionalLiabilityFirstNotice@acegroup.com

      B.      All other notices:

            Chief Underwriting Officer
            ACE USA - Professional Risk
            140 Broadway, 41st. Floor
            New York, NY 10005

**Item 7.** **Policy** Premium:    $1,575,000

**Item 8.** Intentionally left blank

**Item 9.** Optional **Extended Reporting Period**:

    A.    Additional Premium:    100% of Annual Premium

    B.    Additional Period:    12 Months

**Item 10.** **Retroactive Date**:

| | | |
|---|---|---|
| A. | Technology and **Internet** Errors and Omissions Liability | 01/01/1990 |
| B. | **Media Activities** Liability | 01/01/1990 |
| C. | **Network Security** Liability | 01/01/1990 |
| D. | Privacy Liability | 01/01/1990 |
| E. | Data Breach Fund | 01/01/1990 |

IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be countersigned by a duly authorized representative of the **Insurer**.

_____
                   Authorized Representative

DATE: 05/17/2012

MS-7606 (11/11)  Disney manuscript                                



**Illinois Union Insurance Company**

# ACE DigiTech®
## Digital Technology & Professional Liability Insurance Policy

In consideration of the payment of the premium, in reliance upon the **Application**, and subject to the Declarations and the terms and conditions of this **Policy**, the **Insureds** and the **Insurer** agree as follows:

I.     INSURING AGREEMENTS

Coverage is afforded pursuant to the only those Insuring Agreements purchased, as indicated in Item 3 of the Declarations.

A.     Technology and **Internet** Errors and Omissions Liability

The **Insurer** will pay **Damages** and **Claims Expenses** by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**. However this Insuring Agreement A shall not insure that portion of any **Claim** which would be covered under Insuring Agreements C, or D, whether or not such Insuring Agreements were purchased.

B.     **Media Activities** Liability

The **Insurer** will pay **Damages** and **Claims Expenses**, including such **Damages** and **Claims Expenses** arising from liability **Assumed Under Contract**, by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts**, committed solely in the conduct of **Media Activities**, taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

C.     **Network Security** Liability

The **Insurer** will pay **Damages** and **Claims Expenses** by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

D.     Privacy Liability

The **Insurer** will pay **Damages** and **Claims Expenses** by reason of a **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

E.     Data Breach Fund

The **Insurer** will pay **Data Breach Expenses** incurred by the **Insured** during the **Policy Period** by reason of a **Claim** reported to the **Insurer** pursuant to Section VIII, Notice, for any **Wrongful Acts** taking place after the **Retroactive Date** and prior to the end of the **Policy Period**.

II.    DEFINITIONS

When used in this **Policy**:

A.     **Act of Cyberterrorism** means any act, including force or violence, or the threat thereof expressly directed against the **Insured's Computer System** by an individual or group(s) of individuals, whether acting alone, on behalf of or in connection with any organization(s) or government(s), to cause unauthorized access to, unauthorized use of, a denial of service attack or transmission of unauthorized, corrupting or harmful software code to the **Insured's Computer System** for the purpose of furthering social, ideological, religious or political objectives.

B.     **Additional Insured** means:

i.     any third party that distributes, prints, disseminates, displays or broadcasts the media content of any **Insured** listed in 1 – 4 of the definition of **Insured**, including but not limited to films, music, television programs, books, magazines or newspapers in the course of the provision by the **Insured** of **Media Activities**, provided that:

a. an **Insured** entered into a contract to indemnify such third party prior to the commission of the **Wrongful Act** at issue;

b. following the receipt of a **Claim** against such third party, the **Named Insured** has requested to the **Insurer** in writing that the **Insurer** provide coverage for such third party;

c. such third party has not admitted liability in writing with respect to the **Wrongful Act** at issue;

d. coverage for such third party is limited to such third party's vicarious liability for **Wrongful Acts** committed by other **Insured's**, and shall not include **Wrongful Acts** of the third party itself; and

e. the **Claim** at issue does not arise from any matter that prior to the first day of the **Policy Period** any **Insured** knew or reasonably should have known would likely lead to such **Claim**;

ii. the agent of an **Insured** (other than your employees or other **Insureds** listed above) performing **Media Activities** on behalf of, and subject to the control and direction of an **Insured** listed in 1 – 4 of the definition of **Insured**, or acting pursuant to a loan-out agreement or production agreement with an **Insured** listed in 1 – 4 of the definition of **Insured**, provided that:

a. an **Insured** entered into a contract to indemnify such agent prior to the commission of the **Wrongful Act** at issue;

b. following the receipt of a **Claim** against such third party, the **Named Insured** has requested to the **Insurer** in writing that the **Insurer** provide coverage for such agent;

c. such agent has not admitted liability in writing with respect to the **Wrongful Act** at issue;

d. the **Claim** at issue does not arise from any matter that' prior to the first day of the **Policy Period**, any **Insured** knew or reasonably should have known would likely lead to such **Claim**;

iii. any third party from whom any other **Insured** listed in 1 – 4 of the definition of **Insured** acquires, purchases or licenses media content, including but not limited to any manuscript, screenplay, or musical work in the course of the provision by the **Insured** of **Media Activities**, provided that:

a. an **Insured** entered into a contract to indemnify such third party prior to the commission of the **Wrongful Act** at issue, or such third party has agreed to hold the **Insured** harmless and defend and indemnify the **Insured** for **Claims** arising from such media content;

b. such third party or any **Insured** listed in 1-4 of the definition of **Insured** has taken all reasonable steps to clear such media content;

c. following the receipt of a **Claim** against such third party, the **Named Insured** has requested to the **Insurer** in writing that the **Insurer** provide coverage for such third party;

d. the **Claim** at issue does not arise from any matter that, prior to the first day of the **Policy Period**, any **Insured** knew or reasonably should have known would likely lead to such **Claim**;

C. **Advertising** means promotional material (including branding, co-branding, sponsorships and endorsements), publicly disseminated on behalf of the **Insured**.

D. **Advertising Services** means promotional material (including branding, co-branding, sponsorships and endorsements), publicly disseminated by the **Insured** on behalf of others.

E. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy**. All such applications, attachments, information and materials are deemed attached to and incorporated into this **Policy**

F. **Assumed Under Contract means:**

1. liability arising from **Wrongful Acts** which is assumed by the **Named Insured** in a written hold harmless or indemnity agreement executed with any third party prior to the commission of the **Wrongful Act** at issue, but only with respect to **Content** provided by the **Named Insured** or by another person or entity with the **Named Insured's** prior written permission, and where such third party with whom the **Named Insured** has entered into such hold harmless or indemnity agreement has no common ownership interest or other affiliation with the **Named Insured**; or

2. liability arising from a written contract or agreement whereby the **Named Insured** or a **Subsidiary** has agreed in writing to provide insurance under this **Policy**, but only if (a) the contract or agreement was executed prior to the commission of the **Wrongful Act** at issue, and (b) the **Wrongful Act** was for or on behalf of, and was previously authorized by, the **Named Insured** or a **Subsidiary**.

G. **Bodily Injury** means injury to the body, sickness, or disease, and death. **Bodily Injury** also means mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock, whether or not resulting from injury to the body, sickness, disease or death of any person.

However, **Bodily Injury** does not mean mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock resulting from a **Wrongful Act** for which coverage is provided under Section I, Insuring Agreements B or D.

H. **Claim** means:

    1. with respect to Insuring Agreements A, B, C, and D:

        a. a written demand against any **Insured** for monetary or non-monetary damages;

        b. a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading; or

        c. an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief;

    2. also, with respect to Insuring Agreements C and D only, a **Regulatory Proceeding**;

    3. with respect to Insuring Agreement E, a written report by the **Insured** to the **Insurer** of a failure by the **Insured** or by an independent contractor for which the **Insured** is legally responsible to properly handle, manage, store, destroy or otherwise control **Personal Information**;

including any appeal therefrom.

I. **Claims Expenses** means:

    1. reasonable and necessary attorneys' fees, expert witness fees and other fees and costs incurred by the **Insurer**, or by the **Insured** with the **Insurer's** prior written consent (which consent shall not be unreasonably withheld), in the investigation and defense of a covered **Claim** (including but not limited to rectification costs under Insuring Agreement B as outlined in Section VIII, Notice, below); and

    2. reasonable and necessary premiums for any appeal bond, attachment bond or similar bond, provided the **Insurer** shall have no obligation to apply for or furnish such bond;

Solely with respect to Insuring Agreement B, **Claims Expenses** shall also include reasonable and necessary attorney fees incurred by the **Insured** to prosecute a declaratory relief action in response to a covered **Claim** alleging copyright or trademark infringement. **Claims Expenses** shall not include wages, salaries, fees or costs of directors, officers or employees of the **Insurer** or the **Insured**.

J. **Computer System** means computer hardware, software, firmware, and the data stored thereon, as well as associated input and output devices, data storage devices, networking equipment and Storage Area Network or other electronic data backup facilities.

K. **Consumer Redress Fund** means a sum of money which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding**. **Consumer Redress Fund** shall not include any sums paid which constitute taxes, fines, penalties, injunctions or sanctions.

L. **Content** means any and all media in all forms and formats in every kind of character in any medium of expression as now exists or may hereafter exist.

M. **Control Group** means the **Named Insured's** Vice President of Risk Management, Senior Vice President Deputy General Counsel – Litigation and Employment, or Chief Information Security Officer (or the functional equivalent of such positions)

N. **Damages** means compensatory damages, any award of prejudgment or post-judgment interest, and settlements which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against any **Insured** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for **Wrongful Acts** to which this **Policy** applies. **Damages** shall not include:

1. any amount for which the **Insured** is not financially liable or legally obligated to pay;

2. matters uninsurable under the laws pursuant to which this **Policy** is construed;

3. (except to the extent specifically permitted in this definition below, and subject to the applicable separate Retention referenced) the cost to comply with any injunctive or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief;

4. loss of fees or profits by the **Insured**, return of fees, commissions or royalties by the **Insured**, or re-performance of services by the **Insured** or under the **Insured's** supervision;

5. disgorgement of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled;

6. **Data Breach Expenses** or any other forensic, notification, crisis management or credit monitoring expenses, unless such expenses constitute compensatory damages of a direct settlement with the injured natural persons of a **Claim** for a **Wrongful Act** as defined in subparagraph 4.a.i of the definition of **Wrongful Act**;

7. liquidated damages pursuant to a contract, unless, even in the absence of such contract, the **Insured** would be liable for such damages as result of a **Wrongful Act**;

8. penalties of any nature, however denominated, arising by contract; and

9. any amounts other than those which compensate solely for a loss caused by a **Wrongful Act**.

**Damages** includes:

a. multiple, punitive and exemplary damages to the extent such damages are insurable under the internal laws of the applicable jurisdiction that most favors coverage for such **Damages**.

b. taxes, fines, penalties and sanctions, if legally insurable;

c. in the event a court issues an injunction or order enjoining the manufacture, duplication, reproduction of copies, distribution, performance, exhibition, publication, transmission, communication by any means whatsoever now or hereafter known of the products and/or services of the **Insured**, whether in whole or in part:

    a) the direct and out of pocket costs of: i) releases, prints, tapes or other copies; ii) advertising and promotion materials, and iii) other products and materials of the **Insured**, but only to the extent that the value thereof is destroyed or lessened as a result of any such injunction or court order:

    b) liability of the **Insured** under contract for the manufacture, duplication, reproduction of copies, distribution, performance, exhibition, publication, transmission or communication by any means whatsoever of the products or services of the **Insured** to reimburse the other party to such contracts for its losses resulting from such injunction or court order.

Further, the **Damages** referenced in c.a) and c.b) directly above shall be subject to a separate Injunctive Relief Retention as stated in Item 5 of the Declarations.

Notwithstanding the foregoing, **Damages** shall not include production costs and loss of profits of the **Insured**. If the **Insurer** does not post a bond to release an injunction, the **Insured**, after consultation with the **Insurer**, may post such a bond at its own expense, in which case the **Insurer** agrees that it will reimburse the **Insured** for the premium on such bond in the event that a final judgment is entered in favor of the **Insured**.

If prior to the issuance of an injunction or court order the **Insured** elects, in good faith and with the consent of the **Insurer** (not to be unreasonably withheld), to withdraw from or forego distribution, performance, use, exhibition, exploitation, publication, transmission or communication of the products and/or services of the **Insured** under circumstances where there exists a substantial possibility that an injunction would be issued if such action were not taken, then the above provisions relating to injunctive relief shall apply as if such an injunction or court order had been issued on the date such election was made.

Further **Damages**, **Claims Expenses**, and **Loss** shall not mean, and this Insuring Agreement will not cover:



    i.    production costs, loss of profits, or the cost of recall, return, reproduction, reprinting or correction of **Matter** by the **Insured**, any additional insured or ay indemnitee afforded coverage under this Insuring Agreement, except as provided in paragraph II.N.1.c. above, and in paragraphs 2i and 2ii of the definition of **Claims Expenses** applicable to Insuring Agreement 1.

    ii.   fines and penalties, including governmental or criminal fines or penalties, or fines and penalties by ASCAP, SESAC, BMI or other music licensing organizations; and

    iii.  any **Insured's** fees or compensation paid to the **Insured**.

With respect to Insuring Agreements C and D only, **Damages** also includes a **Consumer Redress Fund** and **Regulatory Fines**.

O.    **Data Breach Expenses** means those reasonable and necessary expenses incurred by the **Insured** or which the **Insured** becomes legally obligated to pay:

1. to retain third party computer forensics services to determine the scope of a failure of **Network Security**;

2. to comply with **Privacy Regulations**, including but not limited to the consumer notification provisions of **Privacy Regulations** of the applicable jurisdiction that most favors coverage for such expenses;

3. with the **Insurer's** prior written consent (which consent shall not be unreasonably withheld), to voluntarily notify individuals whose **Personal Information** has been wrongfully disclosed;

4. in retaining the services of a public relations firm, crisis management firm or law firm for advertising or related communications solely for the purpose of protecting or restoring the **Insured's** reputation as a result of a **Wrongful Act**;

5. to retain the services of a law firm solely to determine the **Insured's** indemnification rights under a written agreement with an independent contractor with respect to a **Wrongful Act** expressly covered under Insuring Agreement D of this **Policy** and actually or allegedly committed by such contractor; and

6. with the **Insurer's** prior written consent (which consent shall not be unreasonably withheld), for credit monitoring services.

P.    **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Insured**.

Q.    **Extended Reporting Period** means the period(s) for the extension of coverage, if applicable, described in Section V, **Extended Reporting Periods**.

R.    **Insured** means:

1. The **Named Insured**;

2. **Subsidiaries** of the **Named Insured**, but only with respect to **Wrongful Acts** which occur while they are a **Subsidiary**;

3. any past, present or future principal, partner, officer, director, trustee, employee, leased employee or temporary employee of the **Named Insured** or **Subsidiary**, but only with respect to the commission of a **Wrongful Act** committed within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary**; and

4. independent contractors of the **Named Insured** or of a **Subsidiary** who are natural persons, but only with respect to the commission of a **Wrongful Act** within the scope of such person's duties performed on behalf of the **Named Insured** or **Subsidiary**.

S.    **Insured's Computer System** means a **Computer System**:

1. leased, owned, or operated by the **Insured**; or

2. operated for the benefit of the **Insured** by a third party service provider under written contract with the **Insured**.

T.    **Insurer** means the insurance company providing this insurance.

U.    **Internet** means the worldwide public network of computers which enables the transmission of electronic data and which includes intranets, extranets and virtual private networks.

V.    **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, situation, event, transaction, cause or series of related facts, situations, events, transactions or causes.

W.    **Media Activities** means the researching, development, designing, assembling, manufacturing, printing, preparation, packaging, preparation, creation, conception, acquisition, preproduction, production, distribution, sale, licensing, authorization, publication, republication, serialization, licensing, syndication, performance, telecasting, broadcasting and exhibition of the following:

   1.    theatrical, television and other motion pictures; programs; audio and/or video productions; live, recorded, filmed or taped television and radio programs; documentary, industrial, commercial, educational, promotional, charitable, institutional or other forms of programming or activities; stage presentations or plays; scripts, stories, articles, newsletters, brochures, literary or other printed works or publications; commercials; commercial films; phonograph records, CD's, DVD's, video games, tapes, games, contests; informational or instructional material; multimedia productions; music in sheet or any other form; musical concerts, performances, musical tours, music videos, music publishing or recording or other musical activities, and all other **Content** in any medium of expression as now exists or may hereafter exist and utilizing all technologies, including without limitation books, magazines and other printed works, film, photographic and other similar materials, CD-ROM, electronic, magnetic, digital, analog, laser and/or optical based or interactive media, discs, digital or other video discs, computer generated or stored data, images, programming, electric transcriptions, computer and mobile applications, video and/or audio cassettes, and other related activities in the field of entertainment in media, including such entertainment in media relating to Walt Disney Parks or Resorts;
   2.    direct marketing and merchandising and retail activities;
   3.    news gathering, news programming, and news distribution of informational content, programming or materials;
   4.    retail activities or restaurants;
   5.    theme and hard ride parks, indoor and outdoor recreational facilities and location-based entertainment facilities, amphitheater land other live entertainment activities and facilities, virtual reality stations or other forms of entertainment, sports, recreational or leisure time activities;
   6.    sports teams;
   7.    display of **Content**, including **Advertising** and **Advertising Services**, on the **Insured's Website**;
   8.    ownership and/or operation of television and radio and television broadcasting transmission and receiving facilities; channels; stations and networks; free, basic cable, premium, pay-per-view, and satellite networks and services; online services; web sites; interactive cable; interactive video, transmission via satellite, cable, telephone or any other means;
   9.    interactive services, internet technologies and e-commerce services;
   10.   packaging including folding cartons and point purchase displays, signage and media-related project management;
   11.   any other business in which the **Named Insured** and its **Subsidiaries**, as a conglomerate in the field of entertainment is or becomes engaged; or
   12.   the **Advertising**, marketing, and publicizing of everything above.

X.    **Mediation** means a non-binding process in which a neutral panel or individual assists the parties in reaching a settlement agreement. To be considered **Mediation** under this **Policy**, the process must be as set forth in the Commercial Mediation Rules of the American Arbitration Association, or such other process as the **Insurer** may, at its sole option, approve.

Y.    **Multimedia Act** means any:

   1.    intellectual property infringement (but not any patent infringement or trade secret misappropriation), including but not limited to copyright infringement, trademark infringement, trademark dilution, trade dress infringement, trade name or service mark infringement; publicity rights violations, music rights violation, cybersquatting violations, moral rights violations, any act of passing-off, plagiarism, piracy or

any misappropriation of formats, ideas, characters, trade names, character names, titles, plots, musical compositions, performances, voices, merchandising, slogans, graphic material, images, designs, photographs, program materials or artwork, as well the violation of droit moral rights associated with such intellectual property;

2.   breach of an agreement you have entered into to use a third party's copyrighted material, but only to the extent your use inadvertently exceeds express limitations in the agreement regarding the nature or scope of the authorized use of that copyrighted material and only if such breach is asserted in conjunction with and based on the same factual allegations as a claim under a. above;

3.   breach of any express or implied contract arising out of the alleged submission by someone who is not an **Insured** of any material, idea or process (including any newsworthy, literary, dramatic, musical, audio, audiovisual, visual or other similar or analogous material or process used by the **Insured** or others), or breach of trust or confidence arising out of such submission;

4.   defamation or harm to the character or reputation of any person or entity including but not limited to libel, slander, trade libel, product disparagement or injurious falsehood and emotional distress or outrage to the extent it is based on harm to character or reputation;

5.   breach of any duty of confidentiality, invasion or interference with the rights of privacy or publicity, or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice, likeness or identity or unauthorized interception or recording of images or sound in violation of any civil anti-wiretap statute;

6.   promissory estoppel or unintentional breach of contract brought by your newsgathering source, but only to the extent such count(s) directly stem from your promise to protect the anonymity of that source or concerning restrictions on the use of information supplied to you by that source;

7.   failure to give credit or attribution of authorship in accordance with any agreement to which you are a bound signatory, or in connection with material or services furnished to the **Insured** by others;

8.   unfair competition, deceptive business practices, or false designation of origin, but only when asserted in conjunction with and based on the same factual allegations as a claim under a., b., c., or d. above;

9.   negligence or breach of any duty to use reasonable care, including but not limited to negligent transmission of a computer virus, worm, logic bomb or Trojan horse or negligence in connection with a denial of service attack, or negligent misrepresentation but only if arising out of your content in any media; or

10.   trespass, false arrest, unlawful detention or imprisonment, wrongful entry or eviction, malicious prosecution, unlawful eavesdropping or other invasion of the right of private occupancy;

11.   the unintentional breach of an agreement not to reveal the identity of a news source, but only if such revelation is made in order to comply with a court order or legal requirement imposed by the government;

Z.   **Named Insured** means the organization or natural person first specified in Item 1 of the Declarations.

AA.   **Network Security** means those activities performed by the **Insured**, or by others on behalf of the **Insured**, to protect against unauthorized access to, unauthorized use of, a denial of service attack by a third party directed against, an **Act of Cyberterrorism** expressly directed against, or transmission of unauthorized, corrupting or harmful software code to, the **Insured's Computer System**

BB.   **Personal Information** means:

1.   an individual's name, social security number, medical or healthcare data, other protected health information, drivers license number, state identification number, credit card number, debit card number, address, zip code, telephone number, account number, account histories, or passwords; or

2.   other nonpublic personal information as defined in **Privacy Regulations**;

in any format. **Personal Information** shall not include information that is lawfully made available to the general public for any reason, including but not limited to information from federal, state or local government records.

CC. **Personal Injury** means injury arising out of one or more of the following offenses:

1. false arrest, detention or imprisonment;

2. malicious prosecution;

3. libel, slander, or other defamatory or disparaging material;

4. publication or an utterance in violation of an individual's right to privacy; and

5. wrongful entry or eviction, or other invasion of the right to private occupancy.

DD. **Policy** means, collectively, the Declarations, **Application**, this policy form and any endorsements.

EE. **Policy Period** means the period of time specified in Item 2 of the Declarations, subject to prior termination pursuant to Section XIV, Termination of the **Policy**.

FF. **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials, including materials to be recycled, reconditioned, or reclaimed. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

GG. **Privacy Regulations** means the following statutes and regulations associated with the control and use of personally identifiable financial, medical or other sensitive information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) and Health Information Technology for Economic and Clinical Health Act;

2. the Minnesota Plastic Card Security Act;

3. Gramm-Leach-Bliley Act of 1999;

4. the California Security Breach Notification Act (CA SB 1386) and Massachusetts 201 CMR 17;

5. Identity Theft Red Flags under the Fair and Accurate Credit Transactions Act of 2003;

6. Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged violations of unfair or deceptive acts or practices in or affecting commerce; and

7. other similar state, federal, and foreign identity theft and privacy protection legislation that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Personal Information** has potentially been compromised.

HH. **Property Damage** means:

1. physical injury to, or loss or destruction of, tangible property, including the loss of use thereof; and

2. loss of use of tangible property which has not been physically injured, lost, damaged or destroyed.

However, **Property Damage** does not mean physical injury to, loss or destruction of, or loss of use of intangible property, including data.

II. **Regulatory Fines** means any civil monetary fine or penalty imposed by a federal, state, local or foreign governmental entity in such entity's regulatory or official capacity pursuant to its order under a **Regulatory Proceeding**. **Regulatory Fines** shall not include any criminal fines, disgorgement of profits, multiple damages or civil monetary fines or penalties that are not insurable by law.

JJ. **Regulatory Proceeding** means a request for information, demand, suit, civil investigation or civil proceeding by or on behalf of a government agency, commenced by a service of a complaint or similar pleading and alleging the violation of **Privacy Regulations** as a result of the **Insured's Wrongful Act**,

and which may reasonably be expected to give rise to a covered **Claim** under Insuring Agreements C or D of this **Policy**.

KK.   **Retroactive Date** means the date specified in Item 10 of the Declarations for the applicable Insuring Agreement.

LL.   **Subsidiary** means any entity of which the **Named Insured** owns or has the right to vote more than 50% of the outstanding voting securities representing the present right to vote for election of directors, or the managers or members of the board of managers or equivalent executives of a limited liability company, on or before the inception date of the **Policy**, either directly or indirectly, in any combination, by one or more other **Subsidiaries**.  **Subsidiary** also means partnerships or joint ventures that do not meet the above 50% threshold, but coverage for such **Subsidiaries** shall be limited to the percentage of the **Named Insured's** ownership interest in such partnership or joint venture.

MM.   **Technology Products** means computer or telecommunications hardware, software, firmware, or related electronic equipment, including the design, development, manufacturing, assembly, distribution, licensing, leasing, sale, installation, repair or maintenance thereof.

NN.   **Technology Services** means:

1.   information technology consulting and information systems or network analysis, design, programming or integration;

2.   database design and the caching, collecting, compiling, processing, mining, or recording or analysis of data; and

3.   other related services, including:

   a.   information system outsourcing;

   b.   **Website** design, programming or maintenance;

   c.   information system or **Website** hosting;

   d.   **Internet** access services;

   e.   **Internet** search or navigational tool provision;

   f.   electronic mail services;

   g.   electronic data destruction services; and

   h.   application software services delivery.

OO.   **Trade Secret** means information, including a formula, pattern, compilation, program, device, method, technique or process, that derives independent economic value, actual or potential, from not being generally known to or readily ascertainable by other persons who can obtain value from its disclosure or use, so long as reasonable efforts have been made to maintain its secrecy.

PP.   **Website** means the software, content and other materials accessible via the **Internet** at a designated Uniform Resource Locator address.

QQ.   **Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect, breach of duty, or **Personal Injury** offense actually or allegedly committed or attempted by: i) under all Insuring Agreements, any **Insured** in their capacity as such, and ii) additionally, under Insuring Agreement D, by any independent contractor for which the **Insured** is legally responsible:

1.   With respect only to Insuring Agreement A, in:

   a.   the **Insured's** rendering or failure to render **Technology Services** to others for a fee or other consideration, or

   b.   the failure of the **Insured's Technology Products** to perform the function or serve the purpose intended.

2.   With respect only to Insuring Agreement B, a **Multimedia Act** in the rendering of **Media Activities**.

3.   With respect only to Insuring Agreement C, resulting in a failure of **Network Security**.

4.   With respect only to Insuring Agreement D, in:

      a. the failure by the **Insured** or by an independent contractor for which the **Insured** is legally responsible to properly handle, manage, store, destroy or otherwise control:

         i. **Personal Information**; or

         ii. third party corporate information in any format provided to the **Insured** and specifically identified as confidential and protected under a nondisclosure agreement or similar contract with the **Named Insured** or **Subsidiary**; or

      b. an unintentional violation of the **Insured's** privacy policy that results in the violation of any **Privacy Regulation**.

5. With respect only to Insuring Agreement E, in the failure by the **Insured** or by an independent contractor for which the **Insured** is legally responsible to properly handle, manage, store, destroy or otherwise control **Personal Information**.

RR. **Wrongful Employment Practices** means any actual or alleged:

1. wrongful dismissal or discharge or termination of employment, whether actual or constructive;

2. employment-related misrepresentation;

3. violation of any federal, state, or local laws (whether common or statutory) concerning employment or discrimination in employment;

4. sexual harassment or other unlawful workplace harassment;

5. wrongful deprivation of a career opportunity or failure to employ or promote;

6. wrongful discipline of employees;

7. retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity;

8. negligent evaluation of employees;

9. failure to adopt adequate workplace or employment policies and procedures;

10. employment-related libel, slander, or defamation;

11. employment-related invasion of privacy, except with respect to that part of any **Claim** arising out of the loss of **Personal Information** which is otherwise covered under Insuring Agreement D of this **Policy**;

12. employment-related wrongful infliction of emotional distress, except with respect to that part of any **Claim** arising out of the loss of **Personal Information** which is otherwise covered under Insuring Agreement D of this **Policy**; and

13. any actual or alleged discrimination, sexual harassment, or violation of a natural person's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

The foregoing definitions shall apply equally to the singular and plural forms of the respective words.

III.    EXCLUSIONS

The **Insurer** shall not be liable for **Damages**, **Claims Expenses**, or **Data Breach Expenses** on account of any **Claim**:

A.    alleging, based upon, arising out of or attributable to any dishonest, fraudulent, criminal, malicious or intentional act, error or omission, or any intentional or knowing violation of the law by an **Insured**. However, this exclusion shall not apply to **Claims Expenses** or the **Insurer's** duty to defend any such **Claim** until there is a final judgment against the **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for any **Claims Expenses** paid by the **Insurer**. Only facts pertaining to and knowledge possessed by any member of the **Control Group** shall be imputed to any other member of the **Control Group** or to the **Named Insured** or a **Subsidiary**.

Notwithstanding the foregoing, solely with respect to Insuring Agreement B, this exclusion shall not bar coverage for any **Claim** which otherwise is covered by this **Policy** to the extent that:

1. prior to the date the **Insured** engaged in such excluded conduct, the **Insured** had received from its outside legal counsel a written opinion and authorization stating that based on counsel's good faith and reasonable legal evaluation and analysis of the existing law, counsel has concluded that such conduct was legal under and protected by the First Amendment of the United States Constitution or any similar provision of a State Constitution protecting freedom of speech or freedom of the press; and

2. the **Claim** alleges actual malice, as defined by the law, in conjunction with allegations of defamation, libel or slander of a public person, as defined by the law.

B.  for **Bodily Injury** or **Property Damage**;

C.  for breach of any express, implied, actual or constructive contract, warranty, guarantee, or promise, including any actual or alleged liability assumed by the **Insured**, unless: 1) such liability would have attached to the **Insured** even in the absence of such contract, warranty, guarantee, or promise; or 2) with respect to Insuring Agreement B, such liability is **Assumed Under Contract**. This exclusion will not apply to that part of a **Claim** alleging the unintentional failure to perform **Technology Services** with a reasonable standard of care and consistent with industry standards. Further, this exclusion shall not apply to that portion of any **Claim** alleging a **Wrongful Act** as set forth in numbered paragraph 4, subparagraph a.ii, or a **Multimedia Act** as set forth in numbered paragraphs 2, 3, and 11, to the extent explicitly covered therein.

D.  alleging, based upon, arising out of or attributable to the provision of **Technology Services**, **Media Activities** or **Technology Products** for any entity if at the time these services were performed or products provided:

1. any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable, was a principal, partner, director, or officer of such entity; or

2. any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable, owned, directly or indirectly, 10% or more of any such entity if it was a publicly held company, or 30% or more of any such entity if it was a privately held company.

E.  brought or maintained by, on behalf of, or in the right of any **Insured**, or any other natural person or entity for whom or which an **Insured** is legally liable. However, this exclusion shall not apply to **Wrongful Acts** expressly covered under Section I, Insuring Agreement D, or to **Claims** asserted by **Additional Insureds** in their capacity as customers or clients of an **Insured**.

F.  alleging, based upon, arising out of or attributable to any:

1. illegal discrimination of any kind;

2. humiliation, harassment or misconduct based upon, arising out of or related to any such discrimination;

3. **Wrongful Employment Practices**.

G.  alleging, based upon, arising out of or attributable to any price fixing, restraint of trade, monopolization, unfair trade practices or other violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes, or any similar provision of any federal, state, or local statutory law or common law anywhere in the world. However, solely with respect to a **Wrongful Act** expressly covered under Insuring Agreements C or D, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to numbered paragraph 5 of the definition of **Privacy Regulations**. Further, solely with respect to Insuring Agreement B, this exclusion shall not apply to an otherwise covered **Claim** alleging: a) common law unfair competition based on conduct identified in numbered paragraphs 2a, 2d, 2e, and 2j of the definition of **Wrongful Act**, or b) deceptive or unfair business practices arising from a **Wrongful Act** involving the **Insured's** gathering or collection of **Content**.

H.  alleging, based upon, arising out of or attributable to the violation of:

1. the Employee Retirement Income Security Act of 1974, as amended;

2.  the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisors Act, or any other federal, state or local securities law,

any rules or regulations promulgated thereunder, amendments thereof, or any similar federal, state or common law.

I.  alleging, based upon, arising out of or attributable to the gaining in fact of any profit, remuneration or financial advantage to which any **Insured** was not legally entitled. However, this exclusion shall not apply to **Claims Expenses** or the **Insurer's** duty to defend any such **Claim** until there is a final judgment against the **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for any **Claims Expenses** paid by the **Insurer**.   Only facts pertaining to and knowledge possessed by any member of the **Control Group** shall be imputed to any other member of the **Control Group** or to the **Named Insured** or a **Subsidiary**.

J.  for any fees, expenses, or costs paid to or charged by the **Insured**.

K.  alleging, based upon, arising out of or attributable to a **Wrongful Act** committed prior to the beginning of the **Policy Period** if, on or before the earlier of the effective date of this **Policy** or the effective date of any **Policy** issued by the **Insurer** of which this **Policy** is a continuous renewal or a replacement, the **Named Insured's** Vice President of Risk Management, Senior Vice President Deputy General Counsel – Litigation and Employment, or Chief Information Security Officer (or the functional equivalent of such positions) knew or reasonably could have foreseen that the **Wrongful Act** did or could lead to a **Claim**.

L.  alleging, based upon, arising out of, or attributable to:

1.  any prior or pending litigation, **Claims**, demands, arbitration, administrative or regulatory proceeding or investigation filed or commenced on or before the earlier of the effective date of this **Policy** or the effective date of any policy issued by the **Insurer** of which this **Policy** is a continuous renewal or a replacement, or alleging or derived from the same or substantially the same fact, circumstance or situation underlying or alleged therein; or

2.  any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** underlying or alleged therein would constitute **Interrelated Wrongful Acts**.

M.  alleging, based upon, arising out of, or attributable to:

1.  any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other professional liability/errors and omissions policy (excluding any policy solely insuring the **Insured's** retention) before the effective date of this **Policy**, provided that the insurer of such other policy does not challenge such notice on the grounds that it was not in compliance with such policy's claim or wrongful act notice provisions or

2.  any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**.

N.  alleging, based upon, arising out of or attributable to:

1.  the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

2.  any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so.

O.  alleging, based upon, arising out of or attributable to any electrical or mechanical failures or interruption, including but not limited to any electrical disturbance, surge, spike, brownout or blackout, and outages to gas, water, telephone, cable, satellite, telecommunications or other infrastructure.  However, this exclusion shall not apply to failures, interruptions, disturbances or outages of telephone, cable or telecommunications infrastructure under the **Insured's** operational control which are a result of the **Insured's Wrongful Act**.

P.  alleging, based upon, arising out of or attributable to any failure, interruption, or outage to **Internet** access service provided by the **Internet** service provider that hosts the **Insured's Website**, unless such infrastructure is under the **Insured's** operational control.

Q.  alleging, based upon, arising out of or attributable to the inaccurate, inadequate, or incomplete description of the price of goods, products or services, the disclosure of fees, the failure to meet deadlines, or as a result of the **Insured's** cost guarantees, cost representations, contract price, pricing guarantees or

estimates of probable costs or cost estimates being exceeded, or any guarantee or promise of costs savings, return on investment, or profitability.

R.     alleging, based upon, arising out of or attributable to fire, smoke, explosion, lightning, wind, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused.

S.     alleging, based upon, arising out of or attributable to war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power, provided however, with respect to Insuring Agreement C, this exclusion shall not apply to an **Act of Cyberterrorism**.

T.     alleging, based upon, arising out of or attributable to any costs or expenses incurred by any **Insured** or others to recall, repair, replace, upgrade, supplement or remove the **Insured's** products, including products which incorporate the **Insured's** products or services from the marketplace.

U.     alleging, based upon, arising out of or attributable to the manufacturing, mining, use, sale, installation, removal, distribution of or exposure to asbestos, materials or products containing asbestos, asbestos fibers or dust.

V.     alleging, based upon, arising out of or attributable to the planning, construction, maintenance, operation or use of any nuclear reactor, nuclear waste, storage or disposal site, or any other nuclear facility; the transportation of nuclear material, or any nuclear reaction or radiation, or radioactive contamination, regardless of its cause.

W.    alleging, based upon, arising out of or attributable to false or deceptive advertising or any false or deceptive promotion of an **Insured's** products or services. However, this exclusion shall not apply to **Claims Expenses** to defend any such **Claim** until there is a final judgment against the **Insured** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for any **Claims Expenses** paid by the **Insurer**. Further, with respect to a **Wrongful Act** expressly covered under Insuring Agreements C or D, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to numbered paragraph 6 of the definition of **Privacy Regulations**. Further, this exclusion shall not apply to that portion of any otherwise covered **Claim** alleging a) common law unfair competition based on the conduct identified in numbered paragraphs 3, 4, or  5 of the definition of **Multimedia Act**, or b) deceptive or unfair business practices arising from a **Multimedia Act** involving the **Insured's** gathering or collection of **Content**.

X.     alleging, based upon, arising out of or attributable to false, deceptive or unfair business practices or any violation of consumer protection laws.  However, with respect to a **Wrongful Act** expressly covered under Insuring Agreements C or D, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to numbered paragraph 6 of the definition of **Privacy Regulations**.

Y.     alleging, based upon, arising out of or attributable to any validity, invalidity, infringement, violation or misappropriation of any patent or **Trade Secret** by or on behalf of the **Insured**.

Z.     alleging, based upon, arising out of or attributable to any validity, invalidity, infringement, violation or misappropriation of any copyright, service mark, trade name, trademark or other intellectual property (other than patent or **Trade Secret**) of any third party. However, this exclusion shall not apply to Section I, Insuring Agreements A or B.

AA.   alleging, based upon, arising out of or attributable to, with respect to Insuring Agreement B, the failure of any goods or services to conform with the standards of quality or performance.

BB.   for any unsolicited electronic dissemination of faxes, e-mails or other communications by or on behalf of the **Insured** to multiple actual or prospective customers of the **Insured** or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion.  However, with respect to a **Wrongful Act** expressly covered under Insuring Agreement C, this exclusion shall not apply.

CC.   alleging, based upon, arising out of or attributable to any action brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any other federal, state, or local government agency or ASCAP, SESAC, BMI or other licensing or rights organizations in such entity's

regulatory, quasi-regulatory, or official capacity, function or duty. However, with respect to a **Wrongful Act** expressly covered under Insuring Agreements C or D, this exclusion shall not apply.

DD. alleging, based upon, arising out of or attributable to the failure of any digital rights management software or other copy protection mechanism incorporated into the **Insured's Technology Products**.

EE. alleging, based upon, arising out of or attributable to the unauthorized or surreptitious collection of **Personal Information** by the **Insured** or the failure to provide adequate notice that such information is being collected. Solely with respect to the applicability of this exclusion under Insuring Agreements C and D, only facts pertaining to and knowledge possessed by any member of the **Control Group** shall be imputed to any other member of the **Control Group** or to the **Named Insured** or a **Subsidiary**.

FF. alleging, based upon, arising out of or attributable to the **Insured's** intentional failure to disclose the loss of **Personal Information** in violation of any law or regulation. Solely with respect to the applicability of this exclusion under Insuring Agreements C and D, only facts pertaining to and knowledge possessed by any member of the **Control Group** shall be imputed to any other member of the **Control Group** or to the **Named Insured** or a **Subsidiary**.

GG. alleging, based upon, arising out of, or attributable to the **Over-Redemption** of coupons, awards, or prizes from advertisements, promotions, games, sweepstakes, contests or games of chance; **Over-Redemption** means price discounts, prizes, awards, or other valuable consideration given in excess of the total contracted or excepted or expected amount.

IV. ESTATES, LEGAL REPRESENTATIVES AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insureds** shall be considered **Insureds** under this **Policy**, but coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retention shown in Item 5 of the Declarations applicable to **Damages**, **Claims Expenses**, or **Data Breach Expenses** incurred by **Insureds**, shall also apply to **Damages**, **Claims Expenses**, or **Data Breach Expenses** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

V. **EXTENDED REPORTING PERIODS**

If the **Insurer** terminates or does not renew this **Policy** (other than for failure to pay a premium when due), or if the **Named Insured** terminates or does not renew this **Policy** and does not obtain replacement coverage as of the effective date of such termination or nonrenewal, the **Named Insured** shall have the right, upon payment of the additional premium described below, to a continuation of the coverage granted by this **Policy** for at least one **Extended Reporting Period** as follows:

A. Automatic **Extended Reporting Period**

The **Named Insured** shall have continued coverage granted by this **Policy** for a period of 60 days following the effective date of such termination or nonrenewal, but only for **Claims** first made during such 60 days and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal. This Automatic **Extended Reporting Period** shall immediately expire upon the purchase of replacement coverage by the **Named Insured**.

B. Optional **Extended Reporting Period**

The **Named Insured** shall have the right, upon payment of the additional premium set forth in Item 9A of the Declarations, to an Optional **Extended Reporting Period**, for the period set forth in Item 9B of the Declarations following the effective date of such termination or nonrenewal, but only for **Claims** first made during such Optional **Extended Reporting Period** and arising from **Wrongful Acts** taking place prior to the effective date of such termination or nonrenewal.

This right to continue coverage shall lapse unless written notice of such election is given by the **Named Insured** to the **Insurer**, and the **Insurer** receives payment of the additional premium within 60 days following the effective date of termination or nonrenewal.

The first 60 days of the Optional **Extended Reporting Period**, if it becomes effective, shall run concurrently with the Automatic **Extended Reporting Period**.

C.   The **Insurer** shall give the **Named Insured** notice of the premium due for the Optional **Extended Reporting Period** as soon as practicable following the date the **Named Insured** gives such notice of such election, and such premium shall be paid by the **Named Insured** to the **Insurer** within 10 days following the date of such notice by the **Insurer** of the premium due.  The Optional **Extended Reporting Period** is not cancelable and the entire premium for the Optional **Extended Reporting Period** shall be deemed fully earned and non-refundable upon payment.

D.   The Automatic and Optional **Extended Reporting Periods** shall be part of and not in addition to the Limit of Liability for the immediately preceding **Policy Period**.   The Automatic and Optional **Extended Reporting Periods** shall not increase or reinstate the Limit of Liability, which shall be the maximum liability of the **Insurer** for the **Policy Period** and the Automatic and Optional **Extended Reporting Period**, combined.

E.   A change in **Policy** terms, conditions, exclusions and/or premiums shall not be considered a nonrenewal for purposes of triggering the rights to the Automatic or Optional **Extended Reporting Period**.

## VI.   LIMITS OF LIABILITY

Regardless of the number of Insuring Agreements purchased under this **Policy**, **Insureds** against whom **Claims** are brought, **Claims** made or persons or entities making **Claims**:

A.   Limit of Liability for Insuring Agreement(s) Purchased

1.   With respect to Insuring Agreements A, B, C, and D:

a.   the Each **Claim** Limit of Liability stated in Item 4A of the Declarations is the **Insurer's** maximum liability under the applicable Insuring Agreement for the sum of all **Damages** and all **Claims Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.   the Aggregate Limit of Liability stated in Item 4A of the Declarations is the **Insurer's** maximum liability under the applicable Insuring Agreement for the sum of all **Damages** and all **Claims Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

2.   With respect to Insuring Agreement E:

a.   the Each **Claim** Limit of Liability stated in Item 4A of the Declarations is the **Insurer's** maximum liability under Insuring Agreement E for the sum of all **Data Breach Expenses** because of each **Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.   the Aggregate Limit of Liability stated in Item 4A of the Declarations is the **Insurer's** maximum liability under Insuring Agreement E for the sum of all **Data Breach Expenses** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

3.   With respect to Insuring Agreements C and D only, and notwithstanding the otherwise applicable Each **Claim** and Aggregate Limits of Liability stated in Item 4A of the Declarations:

a.   the Each **Claim Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations is the **Insurer's** maximum liability under Insuring Agreements C and D for the sum of all **Damages** and all **Claims Expenses** incurred because of each **Regulatory Proceeding Claim**, including each **Claim** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

b.   the Aggregate **Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations is the **Insurer's** maximum liability under Insuring Agreements C and D for the sum of all **Damages** and all **Claims Expenses** incurred because all **Regulatory Proceeding Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Wrongful Acts**, first made and reported during the **Policy Period**.

c.   the **Regulatory Proceeding** Sub-Limit of Liability shall be part of and not in addition to the otherwise applicable Each **Claim** or Aggregate Limits of Liability stated in Item 4A of the Declarations, and will not increase the **Insurer's** Limit of Liability as provided therein.

Notwithstanding the foregoing, the Each **Claim Regulatory Proceeding** Sub-Limit of Liability and Aggregate **Regulatory Proceeding** Sub-Limit of Liability stated in Item 4B of the Declarations shall not apply to that portion of **Damages** which are allocated to the **Consumer Redress Fund**.

4. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

5. **Claims Expenses** and **Data Breach Expenses** shall be part of and not in addition to the applicable Aggregate Limits of Liability stated in Item 4A or 4C of the Declarations, and shall reduce such Aggregate Limits of Liability. If the applicable Limit of Liability is exhausted by payment of **Damages**, **Claims Expenses**, or **Data Breach Expenses**, the obligations of the **Insurer** under this **Policy** shall be completely fulfilled and extinguished. The **Insurer** is entitled to pay **Damages**, **Claims Expenses**, and **Data Breach Expenses** as they become due and payable by the **Insureds**, without consideration of other future payment obligations.

B. Maximum **Policy** Aggregate Limit of Liability

The Maximum **Policy** Aggregate Limit of Liability stated in Item 4C of the Declarations is the **Insurer's** maximum liability under all Insuring Agreements purchased for the sum of all **Damages**, all **Claims Expenses**, and all **Data Breach Expenses** because of all **Claims** under this **Policy**.

C. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**. All **Damages**, **Claims Expenses**, and **Data Breach Expenses** resulting from a single **Claim** shall be deemed, respectively, a single **Damage**, **Claims Expense**, or **Data Breach Expense**.

D. **Damages**, **Claims Expenses**, and **Data Breach Expenses** shall be part of and not in addition to the applicable Limit(s) of Liability shown in Item 4 of the Declarations, and shall reduce such Limit(s) of Liability. If the Limit(s) of Liability are exhausted by payment of **Damages**, **Claims Expenses**, or **Data Breach Expenses**, the obligations of the **Insurer** under this **Policy** shall be completely fulfilled and extinguished.

VII. RETENTION

A. The liability of the **Insurer** shall apply only to that part of **Damages**, **Claims Expenses**, and **Data Breach Expenses**, which are in excess of the applicable Retention amount shown in Item 5 of the Declarations. Such Retention shall be borne by the **Named Insured** and at the risk of all **Insureds**, but the **Named Insured** may obtain other insurance specifically insuring such risk, and payments made by such other insurance covering the Retention will serve to erode the Retention. Further, payment for any **Claim** pursuant to a written third party indemnity agreement with the **Insured**, or where the **Insured** is an additional insured under the insurance policy of a third party, shall also erode the Retention on this **Policy**.

B. A single Retention amount shall apply to **Damages**, **Claims Expenses**, and **Data Breach Expenses** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

C. If different parts of a single **Claim** are subject to different Retentions, the applicable Retention shall be applied separately to each part of the **Damages**, **Claim Expenses**, and **Data Breach Expenses**, but the sum of such Retentions shall not exceed the largest applicable Retention.

VIII. NOTICE

A. The **Control Group** shall, as a condition precedent to the **Insured's** rights under this **Policy**, give to the **Insurer** written notice (including but not limited to written notice by email to the address listed in the Declarations) of any **Claim** in which the sum of **Damages**, **Claims Expenses**, and **Data Breach Expenses** can reasonably be expected to exceed $1,000,000, or any **Claim** filed as a class action claim (whether or not such class is certified) as soon as practicable, but in no event later than 45 days after: (i) the end of the **Policy Period** or (ii) with respect to **Claims** first made during any applicable Automatic or Optional **Extended Reporting Period**, the end of such Automatic or Optional **Extended Reporting Period**.

Solely with respect to **Claims** where the actual or reasonably expected sum of **Damages**, **Claims Expenses**, and **Data Breach Expenses** exceeds $250,000, in lieu of individual written notice of each

**Claim** as referenced above, the **Insured** shall provide the **Insurer** with status reports on all **Claims** reported to the **Insurer** via a **Claims** bordereau on a semi-annual basis, but in no event later than 45 days after: (i) the end of the **Policy Period**, or (ii) with respect to **Claims** first made during any applicable Automatic or Optional **Extended Reporting Period**, the end of such Automatic or Optional **Extended Reporting Period**.  Such bordereau shall include the following information with respect to each **Claim** listed on the bordereau:

1. Identity of Claimant

2. Date **Claim** first made against Insured

3. Brief description of the **Claim**

4. Claimant's monetary demand

5. Identity of counsel retained to defend the **Insured**

6. Current status of **Claim** (to be updated quarterly)

The **Insurer** may at any time request full and specific reporting as to an individual **Claim** on a bordereau report.

All other **Claims** not referenced in the above two paragraphs of this subsection A do not need to be reported by the **Insured** unless and until they reach the stated reporting thresholds.

B. If, during the **Policy Period**, the **Named Insured's** Vice President of Risk Management, Senior Vice President Deputy General Counsel – Litigation and Employment, or Chief Information Security Officer (or the functional equivalent of such positions) becomes aware of any specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy** ("Potential **Claim**"), and if such individual gives written notice to the **Insurer** during the **Policy Period**, the Automatic **Extended Reporting Period**, or, if elected, the Optional **Extended Reporting Period** of:

1. the identity of the potential claimants;

2. a description of the anticipated **Wrongful Act** allegations;

3. the identity of the **Insureds** allegedly involved;

4. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

5. the consequences which have resulted or may result; and

6. the nature of the potential monetary damages;

then any **Claim** which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the **Insurer**.  No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

Further, solely with respect to such Potential **Claim** under Insuring Agreement B, **Media Activities** Liability, **Claims Expenses** will include reasonable and necessary costs incurred by the **Insured** (excluding the **Insured's** lost profits, management costs, mark-up, tax liability, or any measure of lost business income) to rectify the **Wrongful Act**, provided that the **Insured**:

i. notifies the **Insurer** of the **Wrongful Act** as soon as practicable;

ii. demonstrates that a future **Claim** would likely result from such **Wrongful Act** if not rectified;

iii. demonstrates that such future **Claim** would likely be covered under this **Policy** and involve a demand for **Damages** which exceeds the cost of rectifying the **Wrongful Act**, and

iv. obtains the prior written consent of the **Insurer** before incurring such rectification costs, or incurs such costs within ten days of first learning of the **Wrongful Act**  and subsequently provides the **Insurer** with all information and documentation to justify such costs;

If a **Claim** is nevertheless made following the incurring of such rectification costs, then the payment of such rectification costs, if covered by the **Policy**, will be deducted from the amount the **Insurer** otherwise owes in the defense and settlement of such **Claim**.

C. All notices under any provision of this **Policy** shall be in writing (including but not limited to written notice by email to the address listed in the Declarations) and given by prepaid express courier or certified mail properly addressed to the appropriate party.  Notice to the **Insureds** may be given to the **Named Insured**

at the address shown in Item 1 of the Declarations. Notice to the **Insurer** of any **Claim** or **Wrongful Act** shall be given to the **Insurer** at the address set forth in Item 6A of the Declarations. All other notices to the **Insurer** under this **Policy** shall be given to the **Insurer** at the address set forth in Item 6B of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee, or one day following the date such notice is sent, whichever is earlier.

D.  No notice that may be given during the **Policy Period** under section VIII, Notice, at subsection B may be given during the **Extended Reporting Periods**, if elected.

IX.  DEFENSE AND SETTLEMENT

A.  The **Insured**, and not the **Insurer**, shall have the right and duty to defend any covered **Claim** brought against the **Insured** even if such **Claim** is groundless, false or fraudulent. The **Insurer** shall have the right, at its own cost, to effectively associate with the **Insured** in the investigation and defense of any **Claim** as it deems necessary.  The **Insured** shall not:

1.  admit or assume liability without the prior written consent of the **Insurer**;

2.  settle or negotiate to settle any **Claim** unless such settlement fully resolves such **Claim** within the applicable Retention; or

3.  incur any **Claims Expenses** or **Data Breach Expenses** without the prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, provided, however, notwithstanding the foregoing, the **Insured** may incur **Data Breach Expenses** as defined in subsection 3 of the definition of **Data Breach Expenses** without the prior written consent of the **Insurer** up to an aggregate per **Claim** limit of $250,000, after which **Insurer** consent is required, and subject to the applicable Limit of Liability.

B.  The **Insured** shall have the right to appoint defense counsel, after notifying the **Insurer** of the name and hourly rates of such counsel, and subject to the **Insurer's** consent (which shall not be unreasonably withheld), to defend any covered **Claim**. Such counsel shall adhere to the **Insurer's** Litigation Management Program, a copy of which shall be provided to the **Insured** and counsel and shall be deemed incorporated into this **Policy**.

C.  The **Insurer** shall not be liable for any settlement, **Claims Expenses**, **Data Breach Expenses**, assumed obligation or admission to which it has not consented.  The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).  However, if the **Insureds** are able to settle all **Claims** which are subject to a single Retention for an aggregate amount, including **Claims Expenses**, not exceeding such Retention, the consent of the **Insurer** shall not be required for the settlement of such **Claims**.

D.  The **Insurer** shall not be obligated to investigate, pay or settle, or continue to investigate, pay or settle any **Claim** after any applicable Limit of Liability specified in Item 4 of the Declarations has been exhausted by payment of **Damages**, **Claims Expenses**, or **Data Breach Expenses** or by any combination thereof, or after the **Insurer** has deposited the remainder of any unexhausted applicable Limit of Liability into a court of competent jurisdiction. In either such case, the **Insurer** shall have the right to withdraw from the further investigation, payment or settlement of such **Claim** by tendering control of such **Claim** to the **Insured**.

E.  The **Insured** shall cooperate with the **Insurer**. Solely with respect to reportable **Claims** pursuant to the Notice section of this **Policy**, and the **Insured** shall provide to the **Insurer** all information and assistance which the **Insurer** reasonably requests including but not limited to attending hearings, depositions and trials and assistance in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any **Claim** covered by this **Policy**. The **Insured** shall do nothing that may prejudice the **Insurer's** position. The **Insureds** shall immediately forward to the **Insurer**, at the address indicated in Item 6A of the Declarations, every demand, notice, summons, or other process or pleading received by the **Insured** or its representatives.

F.  It is agreed that, except with respect to that part of **Data Breach Expenses** set forth in Section II, subsection J3 of this **Policy**, the **Insured** has the right to incur **Data Breach Expenses** without the **Insurer's** prior consent.  However, the **Insurer** shall, at its' sole discretion and in good faith, reimburse the **Insured** only for such expenses that the **Insurer** deems to be reasonable and necessary.

X.  ALLOCATION

**Damages** and **Claims Expenses** incurred by the **Insured** on account of any **Claim** for which the **Insurer** does not retain the duty to defend shall be allocated between covered and uncovered loss based on the relative legal and financial exposures of the parties and loss at issue.

XI. OTHER INSURANCE

If any **Damages**, **Claims Expenses**, or **Data Breach Expenses** covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall cover such **Damages**, **Claims Expenses**, or **Data Breach Expenses** subject to the **Policy** terms and conditions, only to the extent that the amount of such **Damages**, **Claims Expenses**, or **Data Breach Expenses** are in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**.

XII.  MATERIAL CHANGES IN CONDITIONS

A.  Acquisition or Creation of Another Organization

If, during the **Policy Period**, the **Named Insured**:

1.  acquires voting securities in another organization or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**; or

2.  acquires any organization by merger into or consolidation with the **Named Insured**;

then, subject to the terms and conditions of this **Policy**, such organization shall be covered under this **Policy** but only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation, unless the **Insurer** agrees to provide coverage by endorsement for **Wrongful Acts** taking place prior to such acquisition or creation.

If the total assets of such acquired organization, as reflected in the then most recent consolidated financial statements of the organization, exceeds 10% of the total assets of the **Named Insured** and the **Subsidiaries** as reflected in the then most recent consolidated financial statements of the **Named Insured**, the **Named Insured**, as a condition precedent to coverage with respect to such **Insureds**, shall, no later than 60 days after the effective date of such acquisition or creation:

1.  give written notice of such acquisition or creation to the **Insurer**;

2.  pay any additional premium required by the **Insurer**; and

3.  agree to any additional terms and conditions of this **Policy** as required by the **Insurer**.

B.  Acquisition of the **Named Insured**

If, during the **Policy Period**, any of the following events occurs:

1.  the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

2.  the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least 50% of the directors of the **Named Insured**;

then coverage under this **Policy** will continue in full force and effect until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** taking place before such event.  Coverage under this **Policy** will cease as of the effective date of such event with respect to **Claims** for **Wrongful Acts** taking place after such event.  This **Policy** may not be cancelled after the effective time of the event, and the entire premium for this **Policy** shall be deemed earned as of such time.

C.  Termination of a **Subsidiary**

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to the **Subsidiary** and its **Insured Persons** shall continue until termination of this **Policy**.  Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**.

XIII.  REPRESENTATIONS

A.    The **Insureds** represent and acknowledge that the statements and information contained in the **Application**, including all information provided concerning network security policies and procedures, information management policies and procedures, and business continuity plans and policies, are true and accurate and:

    1.   are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**; and

    2.   shall be deemed material to the acceptance of this risk or the hazard assumed by the **Insurer** under this **Policy**.

B.    It is understood and agreed that:

    1. this **Policy** is issued in reliance upon the truth and accuracy of such representations;

    2. the **Insureds** have and will provide accurate information with regard to loss control audits and network security assessments as required by the **Insurer**; and

    3. if such representations or such information are not true, accurate and complete, this **Policy** shall be null and void in its entirety and the **Insurer** shall have no liability hereunder.

C.    Solely with respect to the applicability of Section XIII, Representations of the **Policy**, only facts pertaining to and knowledge possessed by the person(s) who signed the **Application** or by any member of the **Control Group** shall be imputed to any other member of the **Control Group** or to the **Named Insured** or a **Subsidiary**.

XIV.   TERMINATION OF THE **POLICY**

A.    This **Policy** shall terminate at the earliest of the following times:

    1.   the effective date of termination specified in a prior written notice by the **Named Insured** to the **Insurer**;

    2.   30 days after receipt by the **Named Insured** of a written notice of termination from the **Insurer**;

    3.   10 days after receipt by the **Named Insured** of a written notice of termination from the **Insurer** for failure to pay a premium when due, unless the premium is paid within such 10 day period;

    4.   upon expiration of the **Policy Period** as set forth in Item 2 of the Declarations; or

    5.   at such other time as may be agreed upon by the **Insurer** and the **Named Insured**.

B.    If the **Policy** is terminated by the **Named Insured** or the **Insurer**, the **Insurer** shall refund the unearned premium computed *pro rata*. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

XV. TERRITORY AND VALUATION

All premiums, limits, retentions, Damages, Claims Expenses, Data Breach Expenses, and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the applicable rate of exchange as published in The Wall Street Journal as of the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of loss is due, respectively, or, if not published on such date, the next date of publication of The Wall Street Journal.

Coverage provided under this Policy shall extend to Wrongful Acts and Claims taking place, brought or maintained anywhere in the world.

XVI.   SUBROGATION

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the rights of recovery of the Insureds. The Insureds shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit or otherwise pursue subrogation rights in the name of the **Insureds**. Notwithstanding the foregoing, if the **Insured** enters into a written contract to waive its rights of recovery against another party to a contract, and such waiver reduces or eliminates the **Insurer's** subrogation rights under this **Policy**, such waiver shall not constitute a violation of this section, provided that such contract was entered into by

the **Insured** and effective prior to the commissions of any **Wrongful Act** that would otherwise give rise to the **Insurer's** subrogation right.

## XVII.   AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the giving of notice of **Claim**, the giving or receiving of notice of termination or non renewal, the payment of premiums, the receiving of any premiums that may become due under this **Policy**, the agreement to and acceptance of endorsements, consenting to any settlement, exercising the right to the **Extended Reporting Period**, and the giving or receiving of any other notice provided for in this **Policy**, and all **Insureds** agree that the **Named Insured** shall so act on their behalf.

## XVIII.   ALTERATION, ASSIGNMENT AND HEADINGS

A.   Notice to any agent or knowledge possessed by any agent or by any other person shall not affect a waiver or a change in any part of this **Policy** nor prevent the **Insurer** from asserting any right under the terms of this **Policy**.

B.   No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

C.   The titles and headings to the various parts, sections, subsections and endorsements of the **Policy** are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such parts, sections, subsections or endorsements.

## XIX.   ALTERNATIVE DISPUTE RESOLUTION

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process set forth in this Section.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding **Mediation** administered by any **Mediation** facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by **Mediation** in accordance with the then-prevailing commercial **Mediation** rules of the **Mediation** facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either **Mediation** or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of **Mediation**, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 60 days after the date the **Mediation** shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1 of the Declarations as the principal address of the Named Insured. The Named Insured shall act on behalf of each and every Insured in connection with any ADR process under this Section.

## XX. **ADDITIONAL INSURED** COVERAGE

Subject to the **Named Insured's** written request following the **Named Insured's** review of a **Claim** against an **Additional Insured**, the **Insurer** will pay **Damages** and **Claims Expenses** incurred by such **Additional Insured** due to a **Claim** being made against such **Additional Insured** that directly arises from your media **Content**, but only if the **Named Insured** contracted in writing to indemnify such **Additional Insured** (or to provide insurance of the type afforded by this **Policy**) for such a **Claim** prior to it first being made against such **Additional Insured**.

The only payments the **Insurer** will make toward a **Claim** against such Additional **Insured** under this **Policy** are payments to which the **Named Insured** would be entitled under this **Policy** if the same **Claim** and allegations asserted against such **Additional Insured** had been made against the **Named Insured**.  However, the **Insurer** will not deny coverage for payments toward a **Claim** against such **Additional Insured** due to any failure by the

**Named Insured**  to comply with the notification provisions of this **Policy** where such failure is solely attributable to such **Additional Insured's** failure to timely notify the **Named Insured** of the **Claim** as soon as practicable.

The **Insurer** will not pay for any portion of any **Claim** against an **Additional Insured** that:

- ✓ arises out of any matter that prior to the first day of the **Policy Period** the **Insured** knew or could reasonably have foreseen would be likely to lead to a **Claim** against such **Additional Insured**;

- ✓ relates in whole or in part from an **Additional Insured's** written admission of liability; or

- ✓ arises out of any material created by an **Additional Insured** or any **Media Activities** performed by an **Additional Insured**, except to the extent such **Additional Insured** satisfies the provisions of items ii and iii (where applicable) of the definition of **Additional Insured**.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured<br>**The Walt Disney Company** | | | Endorsement Number<br>**1** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G21654115 006** | Policy Period<br>**05/01/2012  to 05/01/2013** | Effective Date of Endorsement<br>**05/01/2012** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## Trade Or Economic Sanctions Endorsement

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

_____
Authorized Agent

ALL-21101 (11/06) Ptd. in U.S.A.                                                        Page 1 of 1

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **The Walt Disney Company** | | | **2** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **EON** | **G21654115 006** | **06/011/2011 to 05/01/2013** | **05/01/2012** |
| Issued By (Name of Insurance Company) | | | |
| **Illinois Union Insurance Company** | | | |

## Signature Endorsement

By signing and delivering the policy to you, we state that it is a valid contract when countersigned by our authorized representative.

**ILLINOIS UNION INSURANCE COMPANY** (A stock company)

525 W. Monroe Street, Suite 700, Chicago, Illinois 60661

**WESTCHESTER SURPLUS LINES INSURANCE COMPANY** (A stock company)

500 Colonial Center Parkway, Suite 200, Roswell, GA 30076

CARMINE A. GIGANTI, Secretary

JOHN J. LUPICA, President

Authorized Representative

LD-5S23h (07/10) Ptd. in U.S.A.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>**The Walt Disney Company** | | | Endorsement Number<br>**3** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G21654115 006** | Policy Period<br>**06/011/2011 to 05/01/2013** | Effective Date of Endorsement<br>**05/01/2012** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## Service Of Suit Endorsement

Information about service of suits upon the company is given below. Service of process of suits against the company may be made upon the following person, or another person the company may designate:

> Saverio Rocca, Assistant General Counsel
> ACE Group of Insurance Companies
> 436 Walnut Street
> Philadelphia, PA 19106-3703

The person named above is authorized and directed to accept service of process on the company's behalf in any action, suit or proceeding instituted against the company. If the insured requests, the company will give the insured a written promise that a general appearance will be entered on the company's behalf if a suit is brought.

If the insured requests, the company will submit to the jurisdiction of any court of competent jurisdiction. The company will accept the final decision of that court or any Appellate Court in the event of an appeal.  However, nothing in this endorsement constitutes a waiver of company's right to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

The law of some jurisdictions of the United States of America requires that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as the company's agent for service of process. In these jurisdictions, the company designates the Director of Insurance as the company's true and lawful attorney upon whom service of process on the company's behalf may be made. The company also authorizes the Director of Insurance to mail process received on the company's behalf to the company person named above.

If the insured is a resident of Canada, the insured may also serve suit upon the company by serving the government official designated by the law of the insured's province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

_____
                              Authorized Representative

SL-34255 (09/11)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>**The Walt Disney Company** | | | Endorsement Number<br>**4** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G21654115 006** | Policy Period<br>**06/011/2011 to 05/01/2013** | Effective Date of Endorsement<br>**05/01/2012** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### Retention (Item 5) Amended Endorsement

It is agreed that solely with respect to coverage afforded to, and **Wrongful Acts** actually or allegedly committed by Buena Vista Books,  Item 5 of the Declarations is deleted in its entirety and the following is inserted:

Item 5.  Retention:

$500,000         each **Claim** for Coverage B

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

MS-7608 (02/12)                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>**The Walt Disney Company** | | | Endorsement Number<br>**5** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G21654115 006** | Policy Period<br>**06/011/2011 to 05/01/2013** | Effective Date of Endorsement<br>**05/01/2012** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## Retention (Item 5) Amended Endorsement

It is agreed that solely with respect to coverage afforded to, and **Wrongful Acts** actually or allegedly committed by Digisynd, Item 5 of the Declarations is deleted in its entirety and the following is inserted:

Item 5.  Retention:

$500,000          each **Claim** for Coverage B

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

MS-7608 (02/12)                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured **The Walt Disney Company** | | | Endorsement Number **6** |
|---|---|---|---|
| Policy Symbol **EON** | Policy Number **G21654115 006** | Policy Period **06/011/2011 to 05/01/2013** | Effective Date of Endorsement **05/01/2012** |
| Issued By (Name of Insurance Company) **Illinois Union Insurance Company** | | | |

### Retention (Item 5) Amended Endorsement

It is agreed that solely with respect to coverage afforded to, and **Wrongful Acts** actually or allegedly committed by ESPN 30 for 30,  Item 5 of the Declarations is deleted in its entirety and the following is inserted:

Item 5.   Retention:

$5,000,000        each **Claim** for Coverage B

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

MS-7608 (02/12)                                                                                            Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **The Walt Disney Company** | | | **7** |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **EON** | **G21654115 006** | **06/011/2011 to 05/01/2013** | **05/01/2012** |

| Issued By (Name of Insurance Company) |
|---|
| **Illinois Union Insurance Company** |

### Retention (Item 5) Amended

It is agreed that solely with respect to coverage afforded to, and **Wrongful Acts** actually or allegedly committed by T180 Studios LLC,  Item 5 of the Declarations is deleted in its entirety and the following is inserted:

Item 5.  Retention:

      $50,000        each **Claim** for Coverage B

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

MS-7608 (02/12)                                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>**The Walt Disney Company** | | | Endorsement Number<br>**8** |
|---|---|---|---|
| Policy Symbol<br>**EON** | Policy Number<br>**G21654115 006** | Policy Period<br>**06/011/2011 to 05/01/2013** | Effective Date of Endorsement<br>**05/01/2012** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## Retroactive Date Amended

It is agreed that solely with respect to coverage afforded to, and **Wrongful Acts** actually or allegedly committed by Digisynd, Item 10 of the Declarations is deleted in its entirety and the following is inserted:

Item 10. **Retroactive Date**:

|   |   |   |
|---|---|---|
| A. | Technology and **Internet** Errors and Omissions Liability | 06/09/2008 |
| B. | **Media Activities** Liability | 06/09/2008 |
| C. | **Network Security** Liability | 06/09/2008 |
| D. | Privacy Liability (subject to **Regulatory Proceeding** sublimit) | 06/09/2008 |
| E. | Data Breach Fund | 06/09/2008 |

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured **The Walt Disney Company** | | | Endorsement Number **9** |
|---|---|---|---|
| Policy Symbol **EON** | Policy Number **G21654115 006** | Policy Period **06/011/2011 to 05/01/2013** | Effective Date of Endorsement **05/01/2012** |
| Issued By (Name of Insurance Company) **Illinois Union Insurance Company** | | | |

### Retroactive Date Amended

It is agreed that solely with respect to coverage afforded to, and **Wrongful Acts** actually or allegedly committed by T180 Studios LLC, Item 10 of the Declarations is deleted in its entirety and the following is inserted:

Item 10. **Retroactive Date**:

| | | |
|---|---|---|
| A. | Technology and **Internet** Errors and Omissions Liability | 08/07/2008 |
| B. | **Media Activities** Liability | 08/07/2008 |
| C. | **Network Security** Liability | 08/07/2008 |
| D. | Privacy Liability (subject to **Regulatory Proceeding** sublimit) | 08/07/2008 |
| E. | Data Breach Fund | 08/07/2008 |

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

MS-7609 (02/12)                                                                                          Page 1 of 1



*Illinois Union*

INSURANCE COMPANY

525 West Monroe Street, Suite 700
Chicago, IL 60661

# NOTICE

**POLICY NO.**   EON G21654115 006

**NAME OF INSURED:**   The Walt Disney Company

**ADDRESS:**   500 S. Buena Vista Blvd.
Burbank, CA 91521

We are pleased to enclose your policy for this account.

Please be advised that by binding this risk with the above referenced Surplus Lines Insurance Company, you agree that as the Surplus Lines Broker responsible for the placement of this insurance policy, it is your obligation to comply with all States Surplus Lines Laws including completion of any declarations/affidavits that must be filed as well as payment of any and all Surplus Lines taxes that must be the remitted to the State(s). We will look to you for indemnification if controlling Surplus Lines Laws are violated by you as the Surplus Lines broker responsible for the placement.

You further confirm that any applicable state requirement concerning a diligent search for coverage by admitted carriers has been fulfilled in accordance with state law.

Thank you for this placement and your regulatory compliance.

Date: 05/16/2012

WSG-084 (05/11)



☒ Illinois Union Insurance  Company
☐ Westchester Surplus Lines Insurance Company

_____

| | |
|---|---|
| Insured:   **The Walt Disney Company** | Attached To Policy No.:  **G21654115 006** |
| #### | |
| #### | Effective Date:  **05/01/2012** |
| #### | |
| #### | |

## CALIFORNIA SURPLUS LINES NOTIFICATION
# NOTICE:

1.  THE INSURANCE POLICY THAT YOU (HAVE PURCHASED) (ARE APPLYING TO PURCHASE) IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2.  THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3.  THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4.  THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5.  **FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

6.  **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

7.  **CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**

8.  **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

Applicant Signature_____ Date_____

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS NOTICE IS ATTACHED OTHER THAN AS STATED ABOVE.



# U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders

This Policyholder Notice shall not be construed as part of your policy and no coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Reprinted, in part, with permission of ISO Properties, Inc.



**ACE Producer Compensation
Practices & Policies**

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our  website  at http://www.aceproducercompensation.com or by calling the  following toll-free  telephone number: 1-866-512-2862.

ALL-20887 (10/06)



# Access to eRisk Hub®
# Notice to Policyholders

This Policyholder Notice shall be construed as part of your policy but no coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning access to the eRisk Hub®, a private web-based loss prevention portal to help policyholders manage cyber risk.  Founded and managed by NetDiligence®, a leading network security and e-risk assessment services company, the eRisk Hub® is a private, web-based portal containing information and technical resources that can assist you in the prevention of network and privacy losses and support you in the timely reporting and recovery if an incident occurs.

The eRisk Hub® portal is an internet-based service that features news, content and access to leading practitioners in risk management, computer forensics, forensic accounting, crisis communications, legal counsel, and other highly-specialized segments of cyber risk.

**Please note the following:**

1.  The eRisk Hub® portal is private and secure. Do not share portal access instructions with anyone outside your organization. You are responsible for maintaining the confidentiality of the ACE Access Code provided to you.

2.  The eRisk Hub® portal is for ACE clients only. Up to three individuals from your organization may register and use the portal. Ideal candidates include your company's Risk Manager, Compliance Manager, Privacy Officer, IT Operations Manager, or Legal Counsel.

3.  The eRisk Hub® portal contains a directory of experienced providers of cyber risk management and breach recovery services. ACE does not endorse these companies or their respective services. Before you engage any of these companies, we urge you to conduct your own due diligence to ensure the companies and their services meet your needs. Unless otherwise indicated or approved, payment for services provided by these companies is your responsibility.

4.  Should you experience a data breach event, you may choose to call the Incident HELP Hotline listed in the portal for immediate triage assistance. If you engage this service, it is billable to you at the rate of $200 per hour. Please be aware that the hotline service is provided by a third-party network security company. Therefore, calling the hotline does NOT satisfy the claim notification requirements of your policy.

**To register for the eRisk Hub®:**

1.  Send an e-mail request to eriskhub@ace-ina.com including the following information to obtain a copy of your ACE Access Code to the eRisk Hub®:
    a.  Your Name (up to three individuals from you organization may register and use the portal)
    b.  Your Title
    c.  Your Phone Number
    d.  Named Insured (Item 1. of your Policy)
    e.  Policy Number
    Within four business days you will receive a copy of your ACE Access Code.
2.  Go to www.eriskhub.com.
3.  Click on Register.
4.  Complete the registration form (this will require your ACE Access Code from Step 1 above).
5.  Once registered, access the portal by going to www.eriskhub.com and completing the Member Login.

PF-27081 (05/09)

**EXHIBIT 2**



## Executive Liability Value Proposition

## Why Choose Chartis for your Executive Liability Coverage needs?

### UNDERWRITING EXPERTISE & MARKET DEDICATION

- Named the #1 provider of Directors & Officers insurance and Employment Practices Liability insurance [1]
- More than four decades of experience and commitment to the market, offering stable, high-limit capacity with a diverse appetite for risk
- Broad and innovative product offering, including unrivaled international capabilities via our Passport platform
- Ongoing pursuit of outstanding client service through continuous dialogue and client feedback response
- Over 350 dedicated underwriting professionals with an average of 10 years of industry experience
- A dedicated legal staff skilled in developing manuscript solutions tailored to client coverage needs
- Regional offices provide local underwriting presence and authority, delivering expertise and solutions across all lines of business
- Specialized underwriting and claims units focused on key segments, including Errors and Omissions, Financial Institutions, Fidelity and Private and Non-Profit
- Large geographic footprint that benefits companies doing business in multiple international jurisdictions
- Nearly 20,000 unique policyholders [2]

### SUPERIOR CLAIMS MANAGEMENT

- We have a claims staff of 300 who manage 30,000 new claims per year, averaging 2,250 new claims per month
- Our claims management team has an average of 15 years of industry experience for management
- Total payments made by Executive Liability on behalf of its insureds in 2009 totaled more than $1.9 billion
- Resolved claims exceeding $9 million in value have increased over 850 percent since 1996 [3]
- The top 25 claims paid by Executive Liability in 2009 totaled over $300 million

### CHARTIS FINANCIAL SNAP-SHOT

- Chartis U.S. Policyholder Surplus is $28 billion[4] (increased 58% from 12/31/05 to 12/31/09)
- In 2009, Chartis companies wrote in excess of $40 billion gross written premiums worldwide
- Chartis has ample resources to pay policyholder claims, paying $71 million in claims worldwide every business day, in 2009
- Objective sources confirm our company's strong financial standing.  From rating agencies to broker assessments, metrics in the insurance industry indicate that Chartis remains one of the most financially secure insurance organizations
- Our financial strength combined with our experience, global reach and broad range of product and service offerings, solve the insurance needs of 40 million clients worldwide

### STAYING POWER

Our consistent market leadership and commitment has lasted for more than four decades, while other carriers shift their focus and support from year-to-year. Our global underwriting capacity, philosophy and expertise-coupled with our local presence-enables Executive Liability to assess the most complex risks and respond rapidly when unforeseen events occur.

1 The Risk and Insurance Management Society 2009 Benchmark Survey http://www.rims.org/resources/BenchmarkSurvey/Pages/default.aspx.
2 Does not include Programs or Small Business accounts.
3 NERA Economic Consulting.
4 Year ended December 31, 2009.

## INNOVATIVE SOLUTIONS

### Management Liability

**Executive Edge**[SM]: Primary public company D&O coverage with market leading features, including advancement of covered loss for directors and officers when the company fails or refuses to indemnify for any reason, worldwide investigation and inquiry coverage and a simplified "entity vs. insured" exclusion in place of the "insured vs. insured" exclusion.

**Executive Shield:** Follow form excess Side-A Directors & Officers Liability Insurance with Difference In Conditions coverage that is distinct from other Side-A DIC policies. The policy provides individual directors and officers with the coverage they need to protect themselves and their assets when facing a claim.

**PrivateEdge Plus:** A flexible modular package that offers market-leading management and professional liability coverage for private companies of any size. Choose one or combine multiple coverage options to customize a comprehensive program that meets specific business needs.

**Not-for-Profit-Risk-Protector**[®]: A flexible modular package policy designed to help non-profit organization clients manage their management liability and other liability risks. Choose one or combine multiple coverage options to customize a comprehensive program that meets specific business needs. The policy is available to all non-profit organizations regardless of revenue, asset size or employee count.

**Public Entity Plan and Trustee Protector:** A policy that protects individuals who manage governmental entity employee benefit plans from fiduciary liability exposures.

**Financial Institutions Risk Protector**[®]: A modular package of management and professional liability coverages for private and public financial institutions. Coverages can be bundled into one policy to provide flexible protection tailored for a financial institution's full spectrum of management and professional liability risks.

**Excess Edge**[SM]: Follow form excess management and professional liability coverage that reduces the administrative burden facing brokers and their clients when placing excess insurance for directors and officers liability, employment practices liability, fiduciary liability, errors and omissions liability, and other executive liability exposures.

### Professional Liability

**Specialty Risk Protector**[®]: A modular package of professional liability and data network security coverages for all types of businesses. Businesses can bundle multiple lines of coverage into one policy.

**Corporate Counsel Premier**[®]: Provides general counsel and other in-house attorneys employed by public and private companies with coverage for claims alleging professional malpractice.

**Lawyers Professional Liability Program:** This admitted program provides broad coverage for attorneys and includes crisis management coverage to help mitigate damage to a law firm's reputation.

**Personal Identity Coverage:** Enables organizations to extend expert assistance and financial relief to employees, customers or members who are victims of identity theft. This innovative program combines extensive recovery support as well as reimbursement of costs related to a theft incident.

### Value Added Services

**Passport:** State-of-the-market approach for multinationals to secure locally-admitted insurance that is in sync with local requirements and customs, and written in local language worldwide.

**EPL Pak**[®] **Premier:** The Employment Practices Liability Loss Prevention Pack offered through Jackson Lewis, LLP, helps insureds proactively mitigate employment practices exposures. The program includes both training programs that help instill proper employment practices within an organization and resources to keep employers informed of changing statutes, regulations and court decisions shaping the employment landscape.

**CrisisFund**[®]: Built-in crisis management enhancement provides policyholders with professional support, including a 24-hour hotline with access to claims specialists, and immediate funds in the event of a serious crisis. Up to $250,000 of additional policy limits available to cover immediate expenses and an additional $50,000 limit to retain the services of a public relations or crisis management firm.

**Fidelity Research and Investigative Settle Clause (FRISC):** A unique provision in Fidelity policies that allows the insured to select an investigative specialist or forensic accountant to determine the facts of the case and quantify the loss. This sets the stage for an efficient, cooperative loss investigation and settlement process that can save the insured time and money. Even if the loss is ultimately determined to not be covered under the policy, the insurer still pays half of the investigation expenses.

**eDiscovery Solutions:** A litigation-management tool devised to create a strategy to handle the collection of electronically stored information throughout litigation.

**Panel Counsel:** Comprised of some of the nation's premier litigators who specialize in defending securities, employment practices, fiduciary liability and technology litigation. Participating law firms have a proven record of achieving litigation success while maximizing litigation efficiency. Consistent superior performance is required to maintain a position on the panel.

For more information about Executive Liability, please contact us at
executiveliability@chartisinsurance.com or visit www.chartisinsurance.com.



**CHARTIS**
Your world, insured

Chartis is a world leading property-casualty and general insurance organization serving more than 40 million clients in over 160 countries and jurisdictions. With a 90-year history, one of the industry's most extensive ranges of products and services, deep claims expertise and excellent financial strength, Chartis enables its commercial and personal insurance clients alike to manage virtually any risk with confidence.

Chartis is the marketing name for the worldwide property-casualty and general insurance operations of Chartis Inc. For additional information, please visit our website at www.chartisinsurance.com. All products are written by insurance company subsidiaries or affiliates of Chartis Inc. Coverage may not be available in all jurisdictions and is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain coverage may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from the Chartis companies.  Chartis insurance companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by Chartis insurance companies to brokers and independent agents in the United States by visiting our website at www.chartisinsurance.com/producercompensation  or by calling 1-800-706-3102.

91222 (12/09)



### *Chartis Specialty Insurance Company*
**A capital stock company**
THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK
AND IS NOT SUBJECT TO ITS SUPERVISION.



Policy Number:    01-855-73-58                              Replacement of:      01-904-32-87

## EXCESS EDGE®

**NOTICES:** *Depending on the terms, conditions and limitations of the **Followed Policy**, this policy may (1) only provide coverage for loss from claims first made or first made and reported during its **Policy Period**; (2) have its limit of liability reduced by the payment of defense costs and/or claim expenses, and (3) not impose a duty to defend on the **Insurer**. Please read the **Followed Policy** and this policy carefully and discuss the coverage provided thereunder and hereunder with your insurance agent or broker.*

### DECLARATIONS

| | |
|---|---|
| **Policyholder:** | THE WALT DISNEY COMPANY |
| **Policyholder Address:** | 500 S BUENA VISTA ST<br>BURBANK, CA 91521-6709 |
| **Policyholder Domicile:** | California |
| **Insurer Address:** | 175 Water Street, 18th Floor<br>New York, NY 10038 |
| **Claims Address:**  e-mail:<br>Mail: | c-claim@chartisinsurance.com<br>Chartis, Financial Lines Claims<br>P.O. Box 25947<br>Shawnee Mission, KS  66225 |

| | |
|---|---|
| **Limit of Liability:** | $         25,000,000 |
| **Total Underlying Limits:** | $         40,000,000 |
| **Policy Period:**  From: | May 1, 2012 |
| To: | May 1, 2013 |
| **Premium:** | $              540,000 |

### SCHEDULE OF UNDERLYING COVERAGE

| | Underlying Insurer | Underlying Policy | Underlying Limit | Underlying Policy Period |
|---|---|---|---|---|
| | Illinois Union Insurance Company | G21654115006 | $15,000,000 Primary | 05/01/2012 to 05/01/2013 |
| | Beazley | BO823QK1201614 | $15,000,000 xs $15,000,000 | 05/01/2012 to 05/01/2013 |
| * | Swiss Re | H2X0000509-00 | $10,000,000 xs $30,000,000 | 05/01/2012 to 05/01/2013 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

The **Policy Period** incepts and expires as of 12:01 A.M. at the **Policyholder Address**. Terms with **"Bold"** typeface are used in this policy with the meanings and values ascribed to them above; however, subject to the Changes clause, the **"Followed Policy"** means the policy in the Schedule with an "*" at the beginning of its row, but only with respect to the following **Followed Coverage Section(s):** tech, media, sec/priv, em .

*1145656*
103485 (02/10)                                        -1-                      © Chartis Inc. All rights reserved.

In consideration of the payment of the premium, Chartis Specialty Insurance Company (the **"Insurer"**) and insureds agree as follows:

**INSURING AGREEMENT**  This policy shall provide coverage in accordance with the same terms, conditions and limitations of the **Followed Policy**, as modified by and subject to the terms, conditions and limitations of this policy.

The **Insurer's** coverage obligations under this policy attach to the **Insurer** only after the **Total Underlying Limits** have been exhausted through payments by, on behalf of or in the place of the **Underlying Insurers** of amounts covered under the **Underlying Policies**. This policy shall continue in force as primary insurance only upon the exhaustion of the **Total Underlying Limits** by reason of such payments and satisfaction of any applicable retention. This policy shall recognize erosion of an **Underlying Limit** of an **Underlying Policy** through payments by others of covered amounts under that **Underlying Policy**. The risk of uncollectability of any part of the **Total Underlying Limits**, for any reason, is expressly retained by the **Policyholder** and any insureds, and is not insured under this policy or assumed by the **Insurer**.

**LIMIT OF LIABILITY**  The **Limit of Liability** is the aggregate limit of the **Insurer's** liability for all coverage under this policy.

**NOTICES**  Where the **Followed Policy** requires or permits notice to its insurer, the **Policyholder** or the insureds have the same obligations and rights to notify the **Insurer** under this policy, except that with respect to this policy, any notice to the **Insurer** must be directed as follows: (i) for claims-related matters, by mail or e-mail to the **Claims Address**; and (ii) for all other notices, by mail to the **Insurer Address**.

**RIGHTS**  The **Insurer** shall have the same rights, privileges and protections afforded to the **Underlying Insurer** of the **Followed Policy** in accordance with the terms, conditions and limitations of the **Followed Policy**. The **Insurer** shall also have the right, in its sole discretion, but not the obligation, to effectively associate with the insureds in the defense and settlement of any claim that appears to be reasonably likely to involve the **Insurer**. The **Policyholder**, its subsidiaries and any insureds shall provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request and shall not do anything that prejudices the **Insurer's** position or potential rights of recovery.

**RELIANCE**  The **Insurer** has issued this policy in reliance upon the completeness and accuracy of the applications, warranties, statements, the binders for the **Underlying Policies**, any attachments thereto and any other materials submitted for this policy, which shall be deemed attached hereto and made a part hereof.

**CHANGES**  If, subsequent to the issuance of the **Followed Policy**, the terms, conditions or limitations of an **Underlying Policy** are modified, the insureds must notify the **Insurer** in writing, as soon as practicable, of such modification. If any changes to the **Followed Policy**: (i) expand coverage, (ii) change the policyholder name or address, or (iii) modify premium, this policy shall not follow those changes unless the **Insurer** reflects its agreement to do so in a written endorsement to this policy.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

| _David Bresnahan_ | _Robert M Vella_ | _Dei_ |
|---|---|---|
| PRESIDENT | AUTHORIZED REPRESENTATIVE | SECRETARY |

| | | |
|---|---|---|
| COUNTERSIGNATURE (WHERE REQUIRED BY LAW) | DATE | COUNTERSIGNATURE LOCATION |

AON FINANCIAL SERVICES GROUP, INC
200 E RANDOLPH ST 11TH FL
CHICAGO, IL 60601-6436

*1145656*
103485 (02/10)

© Chartis Inc. All rights reserved.

## ENDORSEMENT# 1

This endorsement, effective *12:01 AM*   *May 1, 2012*        forms a part of
policy number   *01-855-73-58*
issued to   *THE WALT DISNEY COMPANY*

by   *Chartis Specialty Insurance Company*

### LIMIT OF LIABILITY AMENDATORY ENDORSEMENT
### (Excess of Sublimits)

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. **Limit of Liability** in the the DECLARATIONS is deleted in its entirety and replaced with
   the following:

   **Limit of Liability:**

   | | | |
   |---|---|---|
   | (i) | Aggregate: | $25,000,000 in the aggregate for all coverage(s) and all insured(s) afforded coverage under this policy combined and excess of **Total Underlying Limits**; |
   | (ii) | Data Breach Fund Sublimit: | $20,000,000 in the aggregate for all Data Breach Expenses covered under Insuring Agreement E the **Followed Policy**; |
   | (iii) | Regulatory Proceeding Sublimit | $20,000,000 in the aggregate for all Damages, and Claim Expenses incurred because of all Regulatory Proceeding Claims covered under Insuring Agreement C or D of the **Followed Policy**. |

2. The terms Claim Expenses, Damages, Data Breach Expenses and Regulatory
   Proceeding Claims shall have the same meaning as ascribed thereto in the **Followed Policy**.

3. The "LIMIT OF LIABILITY" Clause is deleted in its entirety and replaced with the
   following:

   | | | |
   |---|---|---|
   | *LIMIT OF LIABILITY* | (i) | The Aggregate Limit of Liability set forth in (i) of the Declarations is the aggregate limit of the **Insurer's** liability for all coverage under this policy. |
   | | (ii) | The Data Breach Fund Sublimit set forth in (ii) of the Declarations is the aggregate limit of the **Insurer's** liability for all amounts set forth in (ii) and is part of, and not in addition to, and in no way increases the aggregate limit of liability set forth in (i). |
   | | (iii) | The Regulatory Proceeding Sublimit set forth in (iii) of the Declarations is the aggregate limit of the **Insurer's** liability for all amounts set forth in (iii) and is part of, and not in addition to, and in no way increases the aggregate limit of liability set forth in (i). |

MNSCPT                                    *END 1*

ENDORSEMENT# *1* (Continued)

This endorsement, effective *12:01 AM* *May 1, 2012* forms a part of
policy number *01-855-73-58*
issued to *THE WALT DISNEY COMPANY*

by *Chartis Specialty Insurance Company*

4. The second paragraph in the "INSURING AGREEMENT" Clause is amended by
appending the following at the end thereof:

*INSURING*
*AGREEMENT*
Notwithstanding the foregoing, this policy shall continue in force as
primary insurance upon exhaustion of the sub-limits in the **Followed
Policy** for any amounts described in (ii) through (iii) of the
Declarations, but solely with respect to such amounts that are
otherwise covered and solely up to the amount of this policy's
sub-limit for such amounts as set forth in (ii) through (iii). The **Insurer**
shall not be responsible for any other Loss until the exhaustion of the
**Total Underlying Limits**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

© Chartis Inc. All rights reserved.

MNSCPT *END 1*

**ENDORSEMENT# 2**

This endorsement, effective *12:01 AM    May 1, 2012*              forms a part of
policy number  *01-855-73-58*
issued to    *THE WALT DISNEY COMPANY*

by      *Chartis Specialty Insurance Company*

**NOTICE OF CLAIM (REPORTING BY E-MAIL)**
In consideration of the premium charged, it is hereby understood and agreed as follows:

1.      Email Reporting of Claims :  In addition to the postal address set forth for any
Notice of Claim Reporting under this policy, such notice may also be given in writing
pursuant to the  policy's other terms  and conditions  to the Insurer  by email at the
following email address:

c-claim@chartisinsurance.com

Your email must reference the policy number for this policy. The date of the
Insurer's receipt of the emailed notice shall constitute the date of notice. In addition
to Notice of Claim Reporting via email,  notice may also be  given to the Insurer by
mailing such notice to: Chartis, Financial Lines  Claims, P.O. Box  25947, Shawnee
Mission, KS  66225  or faxing such notice to (866) 227-1750.

2.      Definitions : For this endorsement only, the following definitions shall apply:

(a)      "Insurer" means the  "Insurer," "Underwriter" or "Company" or other name
specifically ascribed in  this policy as  the insurance company  or underwriter
for this policy.

(b)      "Notice of Claim  Reporting" means "notice  of claim/circumstance," "notice
of loss" or  other reference in the policy  designated for reporting  of claims,
loss or occurrences  or situations  that may  give rise  or result in  loss under
this policy.

(c)      "Policy" means  the policy,  bond  or other  insurance product  to  which this
endorsement is attached.

3.      This endorsement does not apply to any  Kidnap & Ransom/Extortion Coverage
Section, if any, provided by this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)
© Chartis Inc. All rights reserved.
*END 2*

99758 (08/08)

## ENDORSEMENT# *3*

This endorsement, effective *12:01 AM*     *May 1, 2012*          forms a part of
policy number   *01-855-73-58*
issued to *THE WALT DISNEY COMPANY*

by     *Chartis Specialty Insurance Company*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**COVERAGE TERRITORY ENDORSEMENT**

Payment of loss under this policy shall only be made in full compliance with all United
States of America economic or trade sanction laws or regulations, including, but not
limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC").

_____
**AUTHORIZED REPRESENTATIVE**
Or Countersignature (In states where applicable)

✧ All rights reserved.
*END 003*

89644 (7/05)                         Page 1 of 1

## ENDORSEMENT# *4*

This endorsement, effective *12:01 AM*     *May 1, 2012*                    forms a part of
policy number   *01-855-73-58*
issued to *THE WALT DISNEY COMPANY*

by   *Chartis Specialty Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 103485 | 02/10 | EXCESS DEC AND POLICY - CSIC - NONADMITTED |
| MNSCPT | | LIMIT OF LIABILITY AMENDATORY ENDORSEMENT |
| 99758 | 08/08 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |
| 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

*END 004*



# CHARTIS

## CLAIM REPORTING FORM

Issuing Company: *Chartis Specialty Insurance Company*

Reported under Policy/Bond Number: _01-855-73-58_     Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*THE WALT DISNEY COMPANY* _____

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext_____

eMail: _____ @ _____

Case or Claimant Name: _____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *AON FINANCIAL SERVICES GROUP, INC*

Address: *200 E RANDOLPH ST 11TH FL, CHICAGO, IL 60601-6436*

Address: _____

Contact: *JOHN BROSNAN*          Phone: _____

eMail: _*john.brosnan@aon.com*_

Send Notice of Claims to:   Chartis              Phone: (888) 602-5246
                            Financial Lines Claims    Fax:   (866) 227-1750
                            P.O. Box 25947       Email: c-Claim@chartisinsurance.com
                            Shawnee Mission, KS 66225


**CHARTIS**

## · CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL
### (Only complete this supplemental if the Claim is being reported under Fidelity Coverage)

Issuing Company: *Chartis Specialty Insurance Company*

Reported under Policy/Bond Number: _01-855-73-58_

Date of Discovery: ———————————— Estimated Amount of loss: ————————

Cause of Loss:    Employee Dishonesty    _____        Computer Fraud        _____

Funds Transfer    _____        Robbery/Burglary        _____

ID Theft    _____        Forgery        _____

Client Property    _____        In Transit        _____

ERISA    _____        Credit Card Forgery        _____

Other    _____        if Other, describe: _____

Send Notice Of Claims To:    Chartis
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone:  (888) 602-5246
Fax:     (866) 227-1750
Email:  c-Claim@chartisinsurance.com

*centralized Customer Link and Information Management*

# EXHIBIT 3

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

DIRECT DIAL: (212) 506-1777
DIRECT FAX: (212) 835-5077
MBOWE@KASOWITZ.COM

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

June 22, 2017

By Email

Martin H. Myers, Esq.
Covington & Burling LLP
One Front Street
San Francisco, CA 94111-5356

Rukesh A. Korde, Esq.
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956

| | |
|---|---|
| **Insured:** | **The Walt Disney Company** |
| **Claimant:** | ███ ███ |
| **Policy Nos:** | **01-855-73-58 (Chartis Specialty)** |
| | **023810889 (Chartis Excess Limited)** |
| **Claim Nos.:** | **550-099453 & 550-100724** |

Dear Counsel :

We write on behalf of Chartis Specialty Insurance Company ("CSIC") and Chartis Excess Limited ("Chartis Excess", together with CSIC, the "AIG Insurers") in response to your June 20, 2017 letter and to follow up on the parties' recent correspondence.

Your letter seeks (1) the AIG Insurers' consent to and approval ███████████████████████████████ CSIC Policy No. 01-855-73-58 and Chartis Excess Policy No. 550-099453 (the "Policies"), and (2) the AIG Insurers' commitment to ████████████████████████████████.

With regard to your first request, as the AIG Insurers previously articulated to you (and as acknowledged in your June 20 letter), the AIG Insurers will not raise lack of consent as a coverage defense under the Policies.  By agreeing to not raise

K ASOWITZ  B ENSON  T ORRES  LLP

Martin H. Myers, Esq.
Rukesh A. Korde, Esq.
June 22, 2017
Page 2

lack of consent as a coverage defense under the Policies, the
AIG Insurers are not agreeing with the propriety of your advance
request for settlement authority ███████████████████████████
█████████.

     With regard to your second request, for the reasons the AIG
Insurers previously articulated to you, the AIG Insurers do not
believe that there is indemnity coverage under the Policies for
a settlement of the ████ matter and thus do not agree to
contribute towards such settlement.

     In an effort to try to find a potential path forward, and
pursuant to Section XIX of Illinois Union Policy No.
G21654115006 (05/01/2012-05/01/2013) as ultimately followed by
Chartis Specialty Policy No. 01-855-73-58 (05/01/2012-
05/01/2013), Chartis Specialty formally commences non-binding
mediation to address The Walt Disney Company's claim for
indemnity coverage under the Policy No. 01-855-73-58 (Claim No.
550-099453).

     If you are agreeable, we would also suggest including
Charis Excess Policy No. 23810889 (Claim No. 550-100724) in the
mediation proceeding, without waiver to either party's dispute
resolution rights.

     We propose using JAMS as a mediation facility in New York,
NY.  Please let us know if this mediation facility and location
is acceptable to you, or if you have an alternate suggestion.

                              Sincerely,

                              Michael J. Bowe

cc:   Alexander B. Simkin (Kasowitz) (via asimkin@kasowitz.com)
      ████████████████████████████████████████████████████
      ████████████████████████████████████████

KASOWITZ BENSON TORRES LLP

Martin H. Myers, Esq.
Rukesh A. Korde, Esq.
June 22, 2017
Page 3



# EXHIBIT 4

# COVINGTON

BEIJING   BRUSSELS   DUBAI   JOHANNESBURG   LONDON
LOS ANGELES   NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

*By Email and Mail*                                      June 28, 2017

Michael J. Bowe, Esq.
**KASOWITZ BENSON & TORRES**
1633 Broadway
New York, New York 10019

> Re:   Insured:       **The Walt Disney Company/**████████
>        Claimant:     ████████████████
>        Policy Nos.:  **01-855-73-58 (Chartis Specialty)**
>                      **023810889 (Chartis Excess Limited)**
>        Claim Nos.:   **550-099453**
>                      **550-100724**

Dear Mr. Bowe:

As you know, we represent The Walt Disney Company and affiliated insureds (collectively "Disney") in connection with insurance coverage under the Chartis Specialty and Chartis Excess Media Liability Policies listed above for the claims asserted by ████████████ ████████████████████████████████. This responds to your letter of June 22, 2017 on behalf of the Chartis/AIG insurers (collectively "AIG") to me and Marty Myers, and to Mr. Simkin's June 27, 2017 email to Karen Kridel-Schwabe regarding the ███ Litigation settlement.

First, thank you for AIG's waiver of a consent-to-settle coverage defense under the Policies.  Second, as we have conveyed in separate correspondence with Ms. Hirschorn, AIG's position denying any possible indemnification obligation under the Policies for the ███ Litigation is seriously in error, and Disney reserves all rights in that regard.  In any event, as we expect the ████████████████████████████████████████████, we will require AIG to cover ████████████ defense costs, including without limitation those incurred for the ███ trial but not yet billed and those related to wrapping up the ███ Litigation.

Third, your June 22 letter claims that AIG "formally commences non-binding mediation" under the Policies.  Respectfully, Disney does not believe that AIG can unilaterally "commence" mediation under the ADR clause.  Rather, Disney regards AIG's position as "electing" mediation pursuant to that clause.  Disney has not determined at this time what ADR process it will elect with respect to this Claim.  As you know, the ███ Parties have just executed a settlement agreement, the terms of which will not be fully consummated for another two months.  Also, we do not yet know the Disney team's availability for ADR proceedings.

**COVINGTON**

Michael J. Bowe, Esq.
June 28, 2017
Page 2

Once the ▮ Litigation settlement has been consummated, we expect to be in position to elect an ADR option and proceed.  Thanks in advance for your cooperation in that regard.

Disney continues to reserve its rights and remedies.

Sincerely,

Rukesh A. Korde

cc:    Alexander Simkin (*by email*)



**EXHIBIT 5**

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

DIRECT DIAL: 212-506-1746
DIRECT FAX: 212-835-5008
ASIMKIN@KASOWITZ.COM

July 7, 2017

<u>By Email</u>

Rukesh A. Korde, Esq.
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956

| | |
|---|---|
| **Insured:** | **The Walt Disney Company** |
| **Claimant:** | ████████ |
| **Policy Nos.:** | **01-855-73-58 (Chartis Specialty)** |
| | **023810889 (Chartis Excess Limited)** |
| **Claim Nos.:** | **550-099453 & 550-100724** |

Dear Mr. Korde:

We write on behalf of Chartis Specialty Insurance Company ("CSIC") and Chartis Excess Limited ("Chartis Excess", together with CSIC, the "AIG Professional Liability Insurers") in response to your June 28, 2017 letter and to follow up on the parties' recent correspondence.

First, we appreciate the cooperation and professionalism of The Walt Disney Company ("Disney") notwithstanding the parties' disagreement as to coverage under the Policies.

Second, your letter states that you ████████████████████████████ and will therefore "require AIG to cover ████████ defense costs, including without limitation those incurred for the ████ trial but not yet billed and those related to wrapping up the ████ Litigation." We are not clear what costs you are asking the AIG Professional Liability Insurers to pay. The Insuring Agreement of CSIC Policy No. 01-855-73-58 states that "[t]he Insurer's coverage obligations under this policy attach to the Insurer only after the Total Underlying Limits have been exhausted through payments by, on behalf of or in the place of the Underlying Insurers of amounts covered under the Underlying Policies." Likewise, the definition of Claims Expenses

Rukesh A. Korde, Esq.
Page 2

incorporated by reference into the CSIC Policy is, in relevant part, "reasonable and necessary attorneys' fees, expert witness fees and other fees and costs incurred by the Insurers, or by the Insured with the Insurer's prior written consent (which consent shall not be unreasonably withheld), in the investigation and defense of a covered Claim." CSIC is happy to consider payment of reasonable defense costs to the extent such costs exceed █████████ (the underlying limits) and otherwise comply with the policy's terms.

Third, your letter argues that CSIC can only commence mediation with Disney's consent. We do not believe that is correct. However, the dispute may be academic in the event that Disney agrees to mediation. We look forward to hearing from you in this regard.

The AIG Professional Liability Insurers continue to reserve all rights and remedies.

Very truly yours,

Alexander B. Simkin

cc:     Michael J. Bowe (Kasowitz) (via asimkin@kasowitz.com)

# EXHIBIT 6

# COVINGTON

BEIJING   BRUSSELS   LONDON   LOS ANGELES
NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

**Martin Myers**

Covington & Burling LLP
One Front Street
San Francisco, CA 94111-5356
T  +1 415 591 7026
mmyers@cov.com

*By Mail and E-mail*                                                September 1, 2017

Michael J. Bowe, Esq.
**KASOWITZ BENSON & TORRES**
1633 Broadway
New York, New York 10019

> **Re:**   **Insured:**      **The Walt Disney Company/**▮▮▮▮▮
>           **Claimant:**     ▮▮▮▮▮
>           **Policy Nos.:** **01-855-73-58 (Chartis Specialty)**
>                            **023810889 (Chartis Excess Limited)**
>           **Claim Nos.:**  **550-099453**
>                            **550-100724**

Dear Mr. Bowe:

As you know, we represent The Walt Disney Company and affiliated insureds (collectively "Disney") in connection with insurance coverage under the Chartis Specialty and Chartis Excess Media Liability Policies listed above for the claims asserted by▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This further responds to your letter of June 22, 2017 on behalf of the Chartis/AIG insurers (collectively "AIG") to me and Rukesh Korde, and to Mr. Simkin's June 27, 2017 email to Karen Kridel-Schwabe regarding the▮▮ Litigation settlement. This letter also captures aspects of our telephone conversation on Friday, September 1, 2017.

Mr. Korde informed you in his June 28, 2017 letter that once the▮▮ settlement was consummated, Disney expected to be in position to elect an ADR Option as it is entitled to do under the ADR Clause of the Illinois Union Policy followed by the Chartis Specialty Policy identified above. As I informed you in our telephone conversation, Disney elects arbitration, and is commencing an arbitration today in California as provided for by the policies. A copy of the Arbitration Demand is enclosed.

Disney has commenced arbitration at JAMS in part based on your proposal that the parties use JAMS to satisfy the ADR clause and in part based on our client's prior use of JAMS, and we assume that JAMS is acceptable to AIG. Nevertheless, as I mentioned to you in our telephone call, Disney is willing to discuss and to negotiate with AIG regarding aspects of the arbitration, including applicable rules, the participation of your client Chartis Excess Limited, and other matters.

SF: 263770-1

**COVINGTON**

Michael J. Bowe, Esq.
September 1, 2017
Page 2

We look forward to further discussing these arbitration specifics with you at your earliest opportunity.

Very truly yours,

COVINGTON & BURLING LLP

By: _____
Martin H. Myers

Attachment
cc:     Alexander Simkin (*by email; w/attachment*)

**EXHIBIT 7**

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

MICHAEL J. BOWE
DIRECT DIAL: (212) 506-1777
DIRECT FAX: (212) 835-5077
MBowe@kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

September 12, 2017

<u>By Email</u>

Martin Myers, Esq.
Covington & Burling LLP
One Front Street
San Francisco, California 94111-5356

| | | |
|---|---|---|
| Re: | Insured: | **The Walt Disney Company** |
| | Claimant: | ██████████████ |
| | Policy Nos.: | **01-855-73-58 (Chartis Specialty)** |
| | | **023810889 (Chartis Excess Limited)** |
| | Claim Nos.: | **550-099453, 550-100724** |

Dear Mr. Myers:

We write in response to your September 1, 2017 letter, to follow up on our September 7, 2017 meeting, and with regard to The Walt Disney Company ("Disney")'s purported attempt to commence arbitration before the Judicial Arbitration Mediation Service ("JAMS") pursuant to Chartis Specialty Insurance Company ("CSIC") Policy No. 01-855-73-58 (the "CSIC Policy").

As an initial matter, we believe it is too late for Disney to elect arbitration pursuant to the CSIC Policy. The alternate dispute resolution provision incorporated into the Policy provides that either the "Insured or the Insurer may elect the type of ADR process." Disney is only entitled to supersede the Insurers' choice of ADR process "prior to its commencement." CSIC "formally commence[d] non-binding mediation" in New York, New York on June 22, 2017. Since that time, the parties have been actively mediating. Thus, Disney's purported election of an alternate ADR process on September 1, 2017 is too late and has no impact other than resulting in the conclusion and termination of the mediation that has been ongoing since June 22, 2017. Unless the parties are able to reach a more comprehensive resolution of the various procedural issues facing them (discussed below), CSIC intends to litigate this issue.

In the meantime, CSIC objects to using JAMS's Los Angeles office as an arbitration facility. The CSIC Policy provides that any arbitration facility must be one "to which the Insured and the Insurer mutually agree." Disney and CSIC have not agreed on any arbitration facility, and Disney's attempt to unilaterally select one is improper.

# Kasowitz Benson Torres llp

Martin Myers, Esq.
September 12, 2017
Page 2

During our call on September 1 and our meeting on September 7, we discussed the fact that the parties are facing various procedural issues, including the prospect of multiple litigations and/or arbitrations in different venues pursuant to different insurance policies.  You proposed a dialogue to see if the parties can agree on a procedure to globally resolve their differences across the various policies potentially implicated by Disney's settlement with ██.  Our client is prepared to engage in such a dialogue.

More specifically, our client would be amenable to using JAMS's New York office as an arbitration facility to jointly resolve coverage issues under both the CSIC Policy and Chartis Excess Limited Policy No. 023810889, using an arbitration panel of three disinterested individuals selected pursuant to JAMS Arbitration Rules & Procedures.  If this is agreeable to your client, we would be prepared to forgo litigating the issue of whether Disney's purported election of an ADR process under the CSIC Policy on September 1, 2017 is too late.

To facilitate an orderly and productive discussion, we also request that Disney confirm its agreement that CSIC has no obligation to respond to the purported Arbitration Demand enclosed with your September 1 letter at this time.  If Disney insists on attempting to proceed with its improper arbitration, we will seek appropriate relief.

We look forward to hearing from you.

Very truly yours,

Michael J. Bowe

cc:    Alexander Simkin (Kasowitz) (via asimkin@kasowitz.com)
       Rukesh Korde (Covington) (via rkorde@cov.com)



# EXHIBIT 8

# COVINGTON

BEIJING  BRUSSELS  LONDON  LOS ANGELES
NEW YORK  SAN FRANCISCO  SEOUL
SHANGHAI  SILICON VALLEY  WASHINGTON

**Martin Myers**

Covington & Burling LLP
One Front Street
San Francisco, CA 94111-5356
T  +1 415 591 7026
mmyers@cov.com

*By Mail and E-mail*                                    September 25, 2017

Michael J. Bowe, Esq.
**KASOWITZ BENSON & TORRES**
1633 Broadway
New York, New York 10019

Re:    Insured:     **The Walt Disney Company/ABC et al.**
       Claimant:    ████████████████
       Policy Nos.: **01-855-73-58 (Chartis Specialty)**
                    **023810889 (Chartis Excess Limited)**
       Claim Nos.:  **550-099453**
                    **550-100724**

Dear Mr. Bowe:

As you know, we represent The Walt Disney Company and affiliated insureds (collectively "Disney") in connection with insurance coverage under the Chartis Specialty and Chartis Excess Limited Media Liability Policies listed above for the claims asserted ████████████████████.

In anticipation of our call scheduled for tomorrow, this further responds to your letter of September 12, 2017 and Mr. Simkin's email of September 20, and follows up on our correspondence and discussions regarding the terms for arbitration(s) of these matters.

Disney's election of arbitration is timely and binding on AIG under the Chartis Specialty policy. The applicable ADR clause provides in relevant part: "the Insured shall have the right to reject the choice by the Insurer of the type of ADR process at any time prior to its commencement, in which case the choice by the Insured of ADR process shall control." Disney never agreed to mediate and mediation never commenced or proceeded. In fact, just six days after AIG notified Disney on June 22, 2017 of AIG's election of mediation, Disney responded that no mediation had been commenced, and Disney would be in position to make its own election under the policy "[o]nce the ██ Litigation settlement has been consummated," which was expected to occur about two months later. AIG did not object to this time-frame, or make any attempt to commence mediation. About two months later, shortly after the ██ Litigation settlement was consummated, on September 1, 2017, Disney notified AIG that it elected arbitration and served Chartis Specialty with an Arbitration Demand that it had filed at JAMS in Los Angeles.

SF: 264724-1

**COVINGTON**

Michael J. Bowe, Esq.
September 25, 2017
Page 2

Disney is prepared to proceed in that arbitration, though at your request we have notified JAMS that the parties are attempting to negotiate aspects of the arbitration(s).  If AIG could "commence" mediation simply by saying "we commence mediation" as you contend, the Insured's right to reject the Insurer's election would be entirely illusory.  We do not believe any court will endorse AIG's position.  Disney is prepared to move to compel arbitration at JAMS in Los Angeles if necessary.  Because AIG has requested that the parties use JAMS and the JAMS Arbitration Rules and Procedures, this letter will confirm that the parties have satisfied Rule 5(a)(1) of those Rules and Procedures.  If AIG attempts to bring litigation on this matter, which we believe would be in further flagrant violation of the Policy, we also remind AIG of its obligations to the Disney insureds to maintain the confidentiality of matters protected in the ███ Litigation and its settlement, ████████████████████████████████████████████████████████████████████████████████

We appreciate that Chartis Excess Limited has agreed to arbitrate this matter at JAMS as well, and Disney wishes to proceed against both AIG entities in one, consolidated JAMS proceeding.  However, as you know, the arbitration clause in the Chartis Excess Limited policy provides for arbitration in London, Bermuda, Vancouver or Toronto, at Disney's election.  If we cannot come to voluntary agreement on where and how these arbitrations will proceed, Disney is prepared to file the attached Arbitration Demand against Chartis Excess Limited in Toronto, and to move to compel Chartis Excess Limited to participate there.  Disney also may move to consolidate the Los Angeles and Toronto arbitrations.

In part because of the differing arbitration clauses involved, and in part to ensure that any award is enforceable and not subject to collateral attack, we believe it is necessary that Disney on the one hand and both AIG entities on the other enter into a short, further Arbitration Agreement that clarifies aspects of the arbitration(s).  Disney is prepared to proceed in Los Angeles and Toronto and to default to the JAMS Rules and Procedures if necessary, but as we have informed you the locations of the panelists or the hearing are less important to Disney than the selection and composition of the panel, to ensure familiarity with the subject matter of this dispute.  Accordingly, we propose the parties enter a further, formal agreement that provides: (1) each side picks one JAMS panelist from any location as non-neutral party arbitrator; (2) the non-neutral panelists select the neutral from any JAMS location, and if they cannot agree JAMS default procedures are followed but including panelists with significant insurance experience from any JAMS location; (3) the panel determines the location(s) for proceedings including hearing; (4) the arbitration clauses in the policies are superseded by the agreement; and (5) the parties are free to seek changes to the default JAMS Rules and Procedures during initial Administrative Conferences and any time before hearing.  We are open to suggestion for further provisions of such an agreement, and we are prepared to draft it once we hear from you.

**COVINGTON**

Michael J. Bowe, Esq.
September 25, 2017
Page 3

We look forward to further discussing these arbitration specifics with you tomorrow.

Very truly yours,

COVINGTON & BURLING LLP

By: *Martin H. Myers*  /ey

Martin H. Myers

Attachment
cc:     Timothy Lowman, Esq. (*by email; w/attachment*)
        Alexander Simkin (*by email; w/attachment*)

# EXHIBIT 9

# COVINGTON

BEIJING   BRUSSELS   DUBAI   JOHANNESBURG   LONDON
LOS ANGELES   NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

Jeffrey A. Kiburtz

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
T +1 424 332 4760
jkiburtz@cov.com

**Via Email**                                                     October 6, 2017

Kathryn Cisneros
**JAMS LOS ANGELES**
555 West Fifth Street, 32nd Floor
Los Angeles, CA 90013

> Re:   *The Walt Disney Company v. Chartis Specialty Insurance
> Company*; Confidential Demand For Arbitration

Dear Ms. Cisneros:

I write on behalf of The Walt Disney Company ("Disney") with regard to the above-captioned Demand for Arbitration Disney filed against Chartis Specialty Insurance Company ("Chartis Specialty," a unit of AIG) with JAMS on September 1, 2017.

As I mentioned to you during our discussion on September 19, 2017, the parties have been discussing whether agreement could be reached on multiple items related to this arbitration, including the selection of arbitrators. Those discussions have reached their endpoint, and the parties have been unable to reach agreement on most issues. Disney therefore requests that JAMS immediately begin the three-arbitrator panel selection process specified in Rule 15 of the JAMS Comprehensive Arbitration Rules & Procedures ("JAMS Rules").

Regarding the parties' agreement to use JAMS as arbitration provider, as reflected in the attached correspondence and in the arbitration clause in the Chartis Specialty policy, the parties have agreed that: (1) JAMS will be the arbitration provider; (2) the panel will be comprised of three disinterested arbitrators; and (3) the arbitration will proceed under the JAMS Rules. In the attached letter dated September 25, 2017 from Disney counsel Martin Myers to Chartis Specialty/AIG counsel Michael Bowe, Disney confirmed that Chartis Specialty/AIG had in fact agreed to proceed at JAMS under the JAMS Rules and, further, that "the parties have satisfied Rule 5(a)(1) of [the JAMS] Rules and Procedures." September 25, 2017 Myers Letter at p. 2. Chartis Specialty has not denied or refuted that confirmation.

While Chartis Specialty/AIG has agreed to JAMS as arbitration provider, it has declined to arbitrate in Los Angeles as the Policy provides, and instead has insisted that it has the right either to litigate this matter in court, or to demand that arbitration proceed at JAMS' offices in New York. While we believe there is no merit to Chartis Specialty/AIG's position, we bring it your attention in case Chartis Specialty/AIG files papers regarding this dispute with JAMS' New York office.

I also write to advise JAMS that Disney will in the near future seek to have a separate arbitration proceeding that it is filing with JAMS' Toronto office against one of Chartis

**COVINGTON**

Kathryn Cisneros
October 6, 2017
Page 2


Specialty/AIG's affiliates consolidated into this arbitration under Rule 6(e) of the JAMS Rules. The other proceeding is captioned *The Walt Disney Company v. American International Reinsurance Company, Ltd., as successor to Chartis Excess Limited*, and is being filed with JAMS' Toronto office today.  That proceeding involves coverage for the same underlying lawsuit under a policy issued by Chartis Specialty/AIG affiliate Chartis Excess Limited ("Chartis Excess").  The Chartis Excess/AIG policy is identical in all material respects to the Chartis Specialty/AIG policy at issue in the Los Angeles filing, except that it attaches at a higher level and has a different arbitration clause.  Accordingly, the substantive issues presented in the Toronto filing are essentially identical to those presented in the Los Angeles filing.  Chartis Specialty and Chartis Excess are represented by the same counsel in these proceedings.  These and other facts will be specified in more detail in a formal request to consolidate that we will submit once the JAMS Toronto office has assigned a case manager.

Thank you for your attention to this matter.  Please do not hesitate to contact me should you have any questions or concerns.


Very truly yours,


COVINGTON & BURLING LLP


By:     /s/ Jeff Kiburtz
         Jeffrey A. Kiburtz


Attachments
cc:     Michael Bowe, Esq. (*by email; w/attachments*)
         Alexander Simkin, Esq. (*by email; w/attachments*)
         Timothy Lowman, Esq. (*by email; w/attachments*)

# EXHIBIT 10

## Kiburtz, Jeff

| | |
|---|---|
| **From:** | Michael J. Bowe <MBowe@kasowitz.com> |
| **Sent:** | Friday, October 6, 2017 1:43 PM |
| **To:** | Myers, Marty; Alexander Simkin |
| **Cc:** | Korde, Rukesh; Kiburtz, Jeff |
| **Subject:** | Re: TWDC v. AIG; ██████████ |
| **Attachments:** | image001.jpg |

   What is regrettable is that you are obviously an untrustworthy liar.  Your letter to JAMS completely misrepresents our discussions. I do thank you though for showing your true colors so that I can proceed accordingly for the remainder of these litigations.  See you in court as they say.

Sent from my BlackBerry Smartphone on the Verizon 4G LTE Network
From: mmyers@cov.com
Sent: October 6, 2017 4:18 PM
To: MBowe@kasowitz.com; ASimkin@kasowitz.com
Cc: rkorde@cov.com; jkiburtz@cov.com
Subject: TWDC v. AIG; ██████████


**External Email**

_____
Please see the attached correspondence and attachments/enclosures.

It is regrettable that Disney and AIG were not able to come to agreement on further aspects of the arbitration(s).  We continue to believe that the filing of a lawsuit or lawsuits in this matter would be frivolous and in serious violation of the policies and Disney's rights, and we remind AIG that it is required by law and agreement strictly to observe the confidentiality of matters relating to the ██ claim, including without limitation ███████████████████████

Marty Myers

Covington & Burling LLP
One Front Street, San Francisco, CA 94111-5356 T +1 415 591 7026 | mmyers@cov.com
www.cov.com<http://www.cov.com>

[cid:image001.jpg@01D33EA5.75263300]
This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.



Michael J. Bowe
Kasowitz Benson Torres LLP
1633 Broadway

New York, New York 10019
Tel.  (212) 506-1777
Fax. (212) 835-5077
MBowe@kasowitz.com


This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

# EXHIBIT 11

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

MICHAEL J. BOWE
DIRECT DIAL: (212) 506-1777
DIRECT FAX: (212) 835-5077
MBowe@kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

October 9, 2017

**VIA FEDEX AND EMAIL**

Katherine Cisneros
JAMS Los Angeles
555 West Fifth Street, 32nd Floor
Los Angeles, California 90013

Re:     *The Walt Disney Company v. Chartis Specialty Insurance Company*

Dear Ms. Cisneros:

We write on behalf of Chartis Specialty Insurance Company ("CSIC") to correct the misstatements and misrepresentations in Jeffrey Kiburtz's October 6, 2017 letter (the "Letter") on behalf of The Walt Disney Company ("Disney") regarding Disney's purported demand for JAMS arbitration of its dispute with CSIC.

In the Letter, Disney claims that CSIC "has agreed to JAMS as an arbitration provider." That statement is false.  The Letter attaches a September 25, 2017 letter that Disney unilaterally sent to CSIC, wherein Disney claims that the "parties have satisfied Rule 5(a)(1)" of the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), meaning that the parties have "[a] post-dispute Arbitration Agreement fully executed by all Parties specifying JAMS administration or use of JAMS Rules."  *See* JAMS Rule 5(a)(i).  That statement is also false, and no such agreement exists.  CSIC's position has consistently been that the parties are required to resolve their dispute in a court.  *See* Sept. 12, 2017 CSIC Letter (noting that "CSIC intends to litigate" and "[i]f Disney insists on attempting to proceed with its improper arbitration, we will seek appropriate relief") (attached to the Letter); Sept. 20, 2017 CSIC Email ("As discussed, our client still believes that Disney is require to litigate its coverage dispute with Chartis Specialty Insurance Company ("CSIC") in a court.") (annexed hereto).  At one point in time, CSIC had offered, as a compromise, to consent to arbitration using JAMS's New York office if Disney would agree to certain conditions.  But Disney rejected CSIC's proposal, and thus there is no agreement to use JAMS.  *See* Oct. 6, 2017 Disney Email ("It is regrettable that Disney and AIG

# KASOWITZ BENSON TORRES LLP

Ms. Katherine Cisneros
October 9, 2017
Page 2

were not able to come to agreement") (annexed hereto).  Accordingly, JAMS lacks any authority to act on this matter.

The dispute resolution provision incorporated by reference into the insurance policy CSIC sold to Disney makes no reference to JAMS or JAMS Rules.  The policy allows either party to elect either mediation or arbitration.  As indicated in its September 12 letter to Disney, which is attached to the Letter, CSIC "formally commence[d] non-binding mediation" in New York, New York on June 22, 2017.  The parties thereafter actively mediated (not using JAMS). The parties' dispute resolution provision provides that, in these circumstances, "either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 60 days after the date the Mediation shall be deemed concluded or terminated."  Disney had the option to reject mediation in favor of arbitration, but only "prior to the commencement" of mediation, which it did not do.  Even if it had done so, the arbitration facility is required to be one to which the parties "mutually agree," and CSIC has not agreed to use JAMS as an arbitration administrator, let alone agreed to JAMS' Los Angeles office as an arbitration facility.

JAMS Rules clearly preclude the relief that Disney seeks through its letter.  Pursuant to JAMS Rule 5, an arbitration can only be commenced "upon the existence of one of the following:"

(i)     A post-dispute Arbitration Agreement fully executed by all Parties specifying JAMS administration or use of any JAMS Rules; or

(ii)    A pre-dispute written contractual provision requiring the Parties to arbitrate the dispute or claim and specifying JAMS administration or use of any JAMS Rules or that the Parties agree shall be administered by JAMS; or

(iii)   A written confirmation of an oral agreement of all Parties to participate in an Arbitration administered by JAMS or conducted pursuant to any JAMS Rules; or

(iv)    The Respondent's failure to timely object to JAMS administration; or

(v)     A copy of a court order compelling Arbitration at JAMS by all Parties specifying JAMS administration or use of any JAMS Rules.

JAMS Rule 5(a).  Because none of these prerequisites is satisfied, JAMS cannot issue a Commencement Letter, and arbitration cannot commence.  Disney asserts jurisdiction under JAMS Rule 5(a)(1), but provides no "post-dispute Arbitration Agreement fully executed by all Parties" – because no such agreement exists.

In an October 4, 2017 telephone call, counsel for CSIC clearly articulated to Disney's counsel that CSIC did not agree to arbitrate at all, let alone to do so using JAMS Los Angeles.

# Kasowitz Benson Torres llp

Ms. Katherine Cisneros
October 9, 2017
Page 3

Disney's misrepresentation of CSIC's position is dishonest and disappointing.  JAMS is thus not empowered to grant any of the requests set forth in the Letter, and it has no jurisdiction over CSIC or this dispute.  We trust JAMS will refrain from taking any action *ultra vires* while the parties litigate their differences.  We would, of course, be happy to discuss with you in a phone call if you would find that helpful.

Very truly yours,

Michael J. Bowe

cc:    Alexander Simkin, Esq. (by email)
       Jeffrey A. Kiburtz, Esq. (by email)
       Martin H. Myers, Esq. (by email)
       Karen Daley (by email and Fedex)

# Exhibits

**Danielle Gill**

| | |
|---|---|
| **From:** | Myers, Marty <mmyers@cov.com> |
| **Sent:** | Friday, October 6, 2017 4:18 PM |
| **To:** | Michael J. Bowe; Alexander Simkin |
| **Cc:** | Korde, Rukesh; Kiburtz, Jeff |
| **Subject:** | TWDC v. AIG; ███████████ |
| **Attachments:** | 2017-10-06 Disney Demand to JAMS Toronto (with all attachments).pdf; 2017.10.06 Kiburtz to JAMS re Disney Arbitration.pdf |

**\*\*External Email\*\***

Please see the attached correspondence and attachments/enclosures.

It is regrettable that Disney and AIG were not able to come to agreement on further aspects of the arbitration(s).  We continue to believe that the filing of a lawsuit or lawsuits in this matter would be frivolous and in serious violation of the policies and Disney's rights, and we remind AIG that it is required by law and agreement strictly to observe the confidentiality of matters relating to the ███ claim, including without limitation ███████████████████████████ .

**Marty Myers**

Covington & Burling LLP
One Front Street, San Francisco, CA 94111-5356
T +1 415 591 7026 | mmyers@cov.com
www.cov.com

**COVINGTON**

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

## Danielle Gill

| | |
|---|---|
| **From:** | Alexander Simkin |
| **Sent:** | Wednesday, September 20, 2017 4:16 PM |
| **To:** | Myers, Marty; Korde, Rukesh |
| **Cc:** | Michael J. Bowe |
| **Subject:** | RE: Disney v. Chartis Specialty |

Marty,

We are following up on our conversation on Friday, September 15.  As we discussed, our client still believes that Disney is require to litigate its coverage dispute with Chartis Specialty Insurance Company ("CSIC") in a court.  Our client had offered to forgo litigating that issue if Disney would agree to the use of JAMS's New York office as an arbitration facility, as further outlined in our September 12 letter.  On our September 15 call, you made a counterproposal with respect to ADR process and we write to respond to that proposal.

First, our client is not interested in proceeding with party-appointed arbitrators.  The CSIC policy requires that the panel "consist of three disinterested individuals" and our client is not willing to modify that provision.  In the event that we agree on an arbitration facility, we believe the arbitration panel should be selected by the method set forth in Rule 15 of JAMS' Comprehensive Arbitration Rules & Procedures.

Second, in an effort to facilitate compromise, our client is willing to agree that JAMS can select one of the three members of the arbitration panel, but not the Chairperson, from a JAMS facility other than the New York facility provided that he or she agrees to travel to JAMS' New York facility for all in-person conferences, arguments, and/or hearings.

Please let us know if these terms are acceptable on your end.

Best,
Alex

---

**From:** Myers, Marty [mailto:mmyers@cov.com]
**Sent:** Friday, September 15, 2017 12:17 PM
**To:** Alexander Simkin <ASimkin@kasowitz.com>
**Cc:** Korde, Rukesh <rkorde@cov.com>; Michael J. Bowe <MBowe@kasowitz.com>
**Subject:** RE: Disney v. Chartis Specialty

I just circulated a dial-in for 12:30/3:30.


## Marty Myers

Covington & Burling LLP
One Front Street, San Francisco, CA 94111-5356
T +1 415 591 7026 | mmyers@cov.com
www.cov.com

## COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** Alexander Simkin [mailto:ASimkin@kasowitz.com]
**Sent:** Thursday, September 14, 2017 12:26 PM
**To:** Myers, Marty <mmyers@cov.com>
**Cc:** Michael J. Bowe <MBowe@kasowitz.com>; ███████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████ Korde, Rukesh <rkorde@cov.com>
**Subject:** RE: Disney v. Chartis Specialty

Marty, we are available to speak with you tomorrow at 3:30pm ET / 12:pm PT.  If that still works for you, can you circulate a dial-in?

Best,
Alex

**From:** Myers, Marty [mailto:mmyers@cov.com]
**Sent:** Wednesday, September 13, 2017 3:24 PM
**To:** Alexander Simkin <ASimkin@kasowitz.com>
**Cc:** Michael J. Bowe <MBowe@kasowitz.com>; ███████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████ Korde, Rukesh <rkorde@cov.com>
**Subject:** RE: Disney v. Chartis Specialty

**External Email**

Thanks.  Are you and Michael available Friday between 10:30 and 1 pacific time to discuss the issues raised in your letter and email?

**Marty Myers**

Covington & Burling LLP
One Front Street, San Francisco, CA 94111-5356
T +1 415 591 7026 | mmyers@cov.com
www.cov.com

## COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** Alexander Simkin [mailto:ASimkin@kasowitz.com]
**Sent:** Tuesday, September 12, 2017 1:32 PM
**To:** Myers, Marty <mmyers@cov.com>
**Cc:** Michael J. Bowe <MBowe@kasowitz.com>; ███████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████ Korde, Rukesh <rkorde@cov.com>
**Subject:** Disney v. Chartis Specialty

Attached please find correspondence from Michael Bowe.

Also, we have been retained to represent Chartis Excess Limited in connection with Disney's request for coverage for the ███████████ litigation. Are you representing Disney in connection with that coverage dispute?  If so, we would like to find a time to discuss the dispute resolution procedure for that case as well.

Alexander Simkin
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Tel.  (212) 506-1746
Fax. (212) 835-5008
ASimkin@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

**EXHIBIT 12**

**Kiburtz, Jeff**

| | |
|---|---|
| **From:** | Kathryn Cisneros <kcisneros@jamsadr.com> |
| **Sent:** | Friday, October 13, 2017 1:32 PM |
| **To:** | Kiburtz, Jeff; mbowe@kasowitz.com; Myers, Marty; Korde, Rukesh |
| **Subject:** | Walt Disney Company vs. Chartis Specialty Insurance Company - REF# 1220057358 |

Dear Counsel,

JAMS is in receipt of Mr. Kiburtz letter dated October 6, 2017, and Mr. Bowe's response letter dated October 9, 2017.

Upon review of the parties' arbitration provision, JAMS was presented with an agreement that does not call for JAMS administration.  Since there is no agreement from the parties to allow JAMS to administer this matter, JAMS cannot proceed with the administration, unless provided with a stipulation from the parties or a court order.

Regards,
Kat



**Kat Cisneros**
ADR Specialist

555 W. 5th Street, 32nd Floor
Los Angeles, CA 90013
kcisneros@jamsadr.com
**Direct:** 213-253-9718
**Main:** 213-620-1133

**JAMS LA: An ideal setting for resolving disputes.**
*Take a video tour.*

U.S. | International | LinkedIn | Twitter