**KASOWITZ BENSON TORRES LLP**
Daniel A. Saunders (SBN 161051)
dsaunders@kasowitz.com
2029 Century Park East, Suite 2000
Los Angeles, CA 90067
Telephone: (424) 288-7900
Facsimile: (424) 288-7901

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE WALT DISNEY COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>AIG SPECIALTY INSURANCE COMPANY f/k/a CHARTIS SPECIALTY INSURANCE COMPANY,<br><br>                    Defendant. | Case No. 2:17-cv-7598 GW (Ex)<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL ARBITRATION**<br><br>Hearing Date: November 16, 2017<br>Hearing Time: 8:30 am |

1

## **<u>TABLE OF CONTENTS</u>**

2

3

PRELIMINARY STATEMENT ...............................................................................1

4

FACTUAL BACKGROUND..................................................................................3

5

ARGUMENT.........................................................................................................9

6

I. THE COURT LACKS JURISDICTION TO CONSIDER THE PETITION ........9

7

8

A.  Disney Lacks Standing To Bring This Petition ................................9

9

B.  ABC and Avila are Necessary and Indispensable Parties, Which Defeats
Diversity Jurisdiction............................................................................10

10

11

C.  Disney Violated The Contractual Waiting Period .........................13

12

II. EVEN IF THE COURT COULD CONSIDER THE PETITION, THE
PARTIES' DISPUTE IS NOT SUBJECT TO ARBITRATION.............................13

13

14

A.  The Contract Does Not Allow Disney to Elect Arbitration After Mediation
Already Commenced ..............................................................................13

15

16

B.  The Uncontroverted Record Evidence is that The Parties Mediated Before
Disney Elected Arbitration ....................................................................16

17

18

III. EVEN IF ARBITRATION WERE PROPER, THE CORRECT
ARBITRATION FACILITY IS ONE IN NEW YORK ..........................................16

19

CONCLUSION.....................................................................................................19

20

21

22

23

24

25

26

27

28

ii

1
2

# <u>TABLE OF AUTHORITIES</u>

3
4

**Page(s)**

5

**Cases**

6
7

*Aguilar v. Los Angeles Cty.*,
    751 F.2d 1089 (9th Cir. 1985) ............................................................................. 11

8
9

*Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*,
    379 F.3d 557 (9th Cir. 2004) ................................................................................. 17

10

*Chavarria v. Ralphs Grocery Co.*,
    733 F.3d 916 (9th Cir. 2013) ................................................................................. 17

11
12

*D. Cummins Corp. v. United States Fid. & Guar. Co.*,
    201 Cal. Rptr. 3d 585 (Cal. Ct. App. 2016) ......................................................... 10

13
14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ................................................................................................ 9

15
16

*Granite State Ins. Co. v. Clearwater Ins. Co.*,
    No. 13-CV-2924, 2013 WL 4482948 (N.D. Cal. Aug. 19, 2013) ....................... 18

17
18

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008) .............................................................................................. 10

19
20

*Johnson & Johnson v. Coopervision, Inc.*,
    720 F. Supp. 1116 (D. Del. 1989) ........................................................................ 12

21

*Lang v. Colonial Pipeline Co.*,
    266 F.Supp. 552 (E.D. Pa. 1967) ......................................................................... 12

22
23

*Meggitt Orange Cty. Inc. v. Nie*,
    No. 13-CV-130239, 2014 WL 12588633 (C.D. Cal. July 17, 2014) ........... 11, 12

24
25

*Munro v. Univ. of S. California*,
    No. 16-CV-166191, 2017 WL 1654075 (C.D. Cal. Mar. 23, 2017) ................... 16

26
27

*New Castle Siding Co., Inc. v. Wolfson*,
    468 N.Y.S.2d 20 (N.Y. App. Div. 1983) ............................................................. 10

28

*Northport Health Servs. of Arkansas, LLC v. Rutherford,*
    605 F.3d 483 (8th Cir. 2010) .................................................................. 11

*Stern v. Cingular Wireless Corp.,*
    453 F. Supp. 2d 1138 (C.D. Cal. 2006) .............................................. 13

*Takeda v. Nw. Nat. Life Ins. Co.,*
    765 F.2d 815 (9th Cir. 1985) ................................................................. 12

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,*
    363 U.S. 574 (1960) ................................................................................ 15

*Vaden v. Discover Bank,*
    556 U.S. 49 (2009) .................................................................................. 10

*U.S. ex rel. Welch v. My Left Foot Children's Therapy, LLC,*
    871 F.3d 791 (9th Cir. 2017) ................................................................. 16

**Rules**

Fed. R. Civ. P. 19 ............................................................................................ 11

Fed. R. Civ. P. 19(a)(1) .................................................................................. 11

iv

Defendant AIG Specialty Insurance Company f/k/a Chartis Specialty Insurance Company ("CSIC") respectfully submits this Memorandum of Law in opposition to The Walt Disney Company's ("Disney") Petition to Compel Arbitration.[1]

## **PRELIMINARY STATEMENT**

Non-party American Broadcasting Companies, Inc. ("ABC") and its employee Jim Avila published a series of news reports where they referred to one of the products manufactured by Beef Products, Inc. ("BPI") as "pink slime."  BPI sued ABC and Avila (the "ABC Defendants"), alleging that the news reports constituted defamation and that BPI suffered hundreds of millions or billions of dollars of damage as a result of the ABC Defendants' purported defamation (the "BPI Litigation").  ABC, Avila, and CSIC are involved in an insurance coverage dispute related to the ABC Defendants' settlement of the BPI Litigation (the "BPI Settlement").  *See AIG Specialty Insurance Company f/k/a Chartis Specialty Insurance Company v. American Broadcasting Companies, Inc.*, *et al.*, New York Supreme Court, New York County, Index No. 656581/2017 (hereinafter "*CSIC v. ABC*").  Disney's only connection to this dispute is that it is the parent company of ABC and that it purchased the insurance policy from CSIC that includes the ABC Defendants as insureds.  Disney nevertheless seeks to compel CSIC to participate in an arbitration (without ABC and Avila) in its unilaterally preferred arbitration facility.  Disney's request should be rejected for at least three reasons.

*First*, the Court lacks jurisdiction over this dispute.  As a threshold matter, Disney has no standing because it is undisputed that, if CSIC owes money to anyone, it is to ABC and Avila, not Disney.  Even if Disney had standing, its failure

---

[1] Disney's Memorandum of Law in Support of Its Motion to Compel Arbitration (ECF Doc. No. 1-1) is referenced herein as "Disney Br.," and the Declaration of Martin Myers in Support of Disney's Motion to Compel Arbitration (ECF Doc. No. 1-2) is referred to as "Myers Decl."

1    to include necessary and indispensable parties ABC and Avila is an independent
2    reason to dismiss this petition without even reaching its merits, as the inclusion of
3    these real parties in interest would deprive the Court of diversity jurisdiction.
4    Furthermore, Disney's initiation of this lawsuit is in violation of the contractual
5    timing provision, which requires Disney to wait 60 days after mediation concluded
6    to initiate a "judicial proceeding."

7         *Second*, Disney's request is not only too late, but it is also in clear violation
8    of the unambiguous contract language.  The relevant alternate dispute resolution
9    ("ADR") provision in the parties' contract allows either side to elect one of two
10   ADR protocols.  One protocol calls for mandatory binding arbitration.  The other
11   protocol calls for non-binding mediation followed by resolution in a court.  Either
12   party is free to elect either protocol, and the insureds are provided with the right to
13   reject the insurers' election but only "prior to its commencement."  On June 22,
14   2017, CSIC "formally commence[d] non-binding mediation."  The parties
15   thereafter spent the next several months engaging in multiple confidential
16   mediation sessions.  Some of the mediation sessions were principal-to-principal and
17   others were through intermediaries.  Following the final mediation session on
18   August 28, 2017, Disney unilaterally terminated mediation by filing an improper
19   arbitration proceeding against CSIC on September 1 and falsely claimed that CSIC
20   had agreed to arbitrate.  Disney now claims that this mediation did not happen
21   because it was not conducted pursuant to the AAA Commercial Mediation Rules.
22   But Disney ignores that the parties' contract allows them to agree to any "other
23   process as the Insurer may, at its sole option, approve."  Myers Decl. Ex. 1 at §
24   II.X.  Furthermore, the uncontroverted evidence submitted to the Court by
25   percipient witnesses is that the parties did mediate.

26        *Third*, even if the Court is inclined to require Disney and CSIC to participate
27   in an arbitration, there is no basis to require CSIC to submit to Disney's unilaterally

28

selected arbitration facility.  The ADR provision only provides for arbitration at an arbitration facility "to which the Insured and the Insurer mutually agree" (that is located in New York, New York or California).  CSIC had previously offered to forgo litigating this dispute if Disney would consent to using JAMS's New York office as the "arbitration facility."  Disney declined that offer and has insisted on arbitrating in its unilaterally preferred arbitration facility.  The Court should decline Disney's request that it rewrite the parties' agreement to give Disney the unilateral right to select an arbitration facility.  In any event, California has no connection to this dispute, which concerns ABC's conduct in New York and New York is where most of the relevant witnesses and documents are located.

## FACTUAL BACKGROUND

### The CSIC Excess Insurance Policy

In 2012, CSIC sold insurance policy number 01-855-73-58 to Disney (the "CSIC Policy").  *See* Myers Decl. Ex. 2.  Disney is the Named Insured under the CSIC Policy, and Disney's subsidiaries and employees are covered as Additional Insureds.  *Id.* at 1; Myers Decl. Ex. 1 at § II.B.  ABC and Avila are purported Insureds under the CSIC Policy.  The CSIC Policy is a "claims-made" policy that provides insurance for certain specified categories of claims asserted from May 1, 2012 to May 1, 2013.  *See* Myers Decl. Ex. 2 at Endorsement 1.  The CSIC Policy is an excess policy that provides up to $25 million of insurance for covered claims in excess of the first $50 million in payments.  *Id.*  The CSIC Policy is a "follow form" policy that, except as modified in certain specified ways, follows the terms and conditions of another lower layer insurance policy.  The CSIC Policy follows form to an insurance policy issued by North American Capacity Insurance Company bearing policy number H2X0000509-00, which also applies to claims asserted for the period of May 1, 2012 to May 1, 2013 (the "Swiss Re Policy").  Exhibit A to the Declaration of Daniel A. Saunders dated October 25, 2017

("Saunders Decl."). The Swiss Re Policy, in turn, follows form to an insurance policy issued by Illinois Union Insurance Company bearing policy number G21654115 006, which also has a policy period of May 1, 2012 to May 1, 2013 (the "ACE Policy"). Myers Decl. Ex. 1.

The ACE Policy is a manuscript policy, which means that it is custom designed for a particular insured and not a standard form. The ACE Policy contains a list of certain specific exclusions that exclude coverage for specific claims or types of claims that would otherwise be covered under the terms of the policy, and the CSIC Policy follows form to those exclusions. Myers Decl. Ex. 1 at § III. Exclusion A states that "[t]he Insurer shall not be liable for Damages, Claims Expenses, or Data Breach Expenses on account of any Claim . . . alleging, based upon, arising out of or attributable to any dishonest, fraudulent, criminal, malicious or intentional act, error or omission, or any intentional or knowing violation of the law by an Insured." *Id.* § III.A. Exclusion A contains a carve-out (the "Defamation Carve-out") that provides that certain defamation claims are excluded from Exclusion A, thus placing them back within the ambit of coverage. *See id.* In order for the Defamation Carve-out to apply, the ACE Policy lists two requirements. *Id.* One requirement is that the Claim for which the Insured is seeking coverage "alleges actual malice, as defined by the law, in conjunction with allegations of defamation, libel or slander of a public person, as defined by law." *Id.* The other requirement is that "prior to the date the Insured engaged in such excluded conduct, the Insured had received from its outside legal counsel a written opinion and authorization stating that based on counsel's good faith and reasonable legal evaluation and analysis of the existing law, counsel has concluded that such conduct was legal under and protected by the First Amendment of the United States Constitution or any similar provision of a State Constitution protecting freedom of speech or freedom of the press." *Id.*

4

The CSIC Policy follows form to the dispute resolution procedure in the ACE Policy. Section XIX of the ACE Policy is entitled "Alternative Dispute Resolution." It provides that "[e]ither an Insured or the Insurer may elect the type of ADR process discussed below," and provides for an election between two choices of ADR process:

> (1) non-binding Mediation administered by any Mediation facility to which the Insurer and Insured mutually agree, in which the Insured and the Insurer shall try in good faith to settle the dispute by Mediation in accordance with the then-prevailing commercial Mediation rules of the Mediation facility; or

> (2) arbitration submitted to any arbitration facility to which the Insured and the Insurer mutually agree, in which the arbitration panel shall consist of three disinterested individuals.

Myers Decl. Ex. 1 at § XIX.

The relevant provision further specifies that, "[i]n the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties . . . . In the event of Mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 60 days after the date the Mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process." *Id.* The ACE Policy continues by saying that "[e]ither ADR process may be commenced in New York, New York or in the state indicated in Item 1 of the Declarations as the principal address of the Named Insured [here, California]." *Id.* The ACE Policy provides the Insured with "the right to reject the choice by the Insurer of the type of ADR process," but only "prior to its commencement." *Id.*

**The BPI Litigation and Settlement**

On September 13, 2012, BPI and two of its affiliates filed the BPI Litigation against defendants including ABC, Avila, and ABC News, Inc. in South Dakota state court, captioned *Beef Products, Inc., et al. v. American Broadcasting*

5

*Companies, Inc., et al.*, Circuit Court of South Dakota, Union County, No. 12-292. Disney was not a defendant.  In their 257-page complaint, BPI claimed to be the victim of a journalistic hit job and asserted multiple counts of defamation and disparagement arising out of the ABC and Avila's purported smear campaign against them, each of which alleged that ABC and Avila acted with actual malice. Saunders Decl. Ex. B.  As alleged in the BPI Litigation, BPI and its affiliated companies pioneered the manufacture of an agricultural product called lean finely textured beef ("LFTB").  *See, e.g.*, *id.* at ¶¶ 2, 44-60.  BPI alleged that ABC and Avila acted with actual malice by knowingly making false statements, or recklessly disregarding the falsity of statements, about BPI and/or LFTB, including statements that:

- LFTB is pink slime, which statement is alleged to be false because pink slime "is a noxious, repulsive, and filthy fluid" and LFTB is not;

- LFTB is not meat or beef, which statement is alleged to be false because LFTB is in fact beef and it is meat, made from beef trimmings that come from USDA-inspected and approved beef; and

- LFTB is "economic fraud" or "food fraud," which statements are alleged to be false because BPI has not engaged in any fraud:  LFTB is beef and BPI obtained approval from the USDA to include LFTB in ground beef without additional labeling.

*See, e.g.*, *id.* at ¶¶ 174-79, 443-45, 518-22.

The BPI Litigation continued through discovery and summary judgment, with the court denying a motion for summary judgment filed by ABC and Avila. *Beef Products, Inc., et al. v. American Broadcasting Companies, Inc., et al.*, Circuit Court of South Dakota, Union County, No. 12-292.  Trial commenced on June 5, 2017.  *Id.*  In June 2017, BPI and ABC reached an agreement to settle the BPI Litigation on terms that were kept confidential from the public (the "BPI Settlement").  *Id.*  In the BPI Settlement, ABC agreed to pay BPI a sum in excess of the limits of the CSIC Policy in exchange for BPI's dismissal of the BPI Litigation

6

1   with prejudice.  *Id.*  Following the execution of the BPI Settlement, BPI dismissed

2   the BPI Litigation on June 28, 2017.  *Id.*

3   **CSIC Commences Mediation and the Parties Mediate**

4        Following the BPI Settlement, Disney demanded that CSIC pay the full

5   limits of the CSIC Policy, $25 million, as partial reimbursement for the BPI

6   Settlement.  Disney made this demand notwithstanding the clear contractual

7   language that excludes the BPI Settlement from coverage under the CSIC Policy.

8        On June 22, 2017, CSIC "formally commence[d] non-binding mediation to

9   address The Walt Disney Company's claim for indemnity coverage under the

10   [CSIC] Policy."  Myers Decl. Ex. 3 at 2.  In its June 28 response, Disney

11   acknowledged CSIC's election of mediation and did not reject it or elect to

12   arbitrate.  *See* Myers Decl. Ex. 4.  Thereafter, the parties did in fact mediate for

13   several months.  The mediation was facilitated by intermediaries from two

14   insurance brokers who sought to assist the parties with their discussions.  Senior

15   executives of CSIC met with the intermediaries in person, by telephone, and by

16   email and also met directly with a senior executive of ABC and Disney by

17   telephone and email to discuss possible compromises of the parties' disputes.

18   Declaration of Larry Fine ("Fine Decl.") ¶ 7.  For example, a senior executive of

19   ABC and Disney participated in a telephonic mediation session with a senior

20   executive of CSIC on Monday, August 28.  *Id.* ¶ 8.  In advance of this mediation

21   session, the parties agreed in writing that the contents of their discussions were

22   "confidential compromise negotiations . . . subject to the prohibitions and

23   protections of Federal Rule of Evidence 408(a)."  *Id.* ¶ 9.  The August 28 mediation

24   session was arranged by a New York-based intermediary from one of the two

25   insurance brokers who were involved in the claim dispute.  *Id.* ¶ 8.  There were

26   various other mediation sessions, some of which involved direct communications

27   between the parties and some of which involved communications with

28

1    intermediaries who were speaking to both sides. *Id.* ¶ 7.  CSIC's executives were

2    primarily in New York for the mediation sessions and never traveled to California

3    for a mediation session. *Id.*

4    **JAMS Rejects Disney's Improper Arbitration**

5          Following the August 28 mediation session, Disney terminated mediation on

6    September 1, 2017 by unilaterally purporting to initiate an improper arbitration

7    against CSIC using the Los Angeles office of JAMS (the "Purported Arbitration").

8    *See* Myers Decl. Ex. 6.  Disney's Purported Arbitration is contrary to the

9    requirements of the CSIC Policy because, among other reasons, Disney is not

10   permitted to elect arbitration after mediation has already commenced.  Myers Decl.

11   Ex. 1 at § XIX.  Instead, the CSIC Policy provides that, upon termination of

12   mediation, the prescribed dispute resolution mechanism is commencement of "a

13   judicial proceeding" in either New York or California. *Id.*  Disney's Purported

14   Arbitration is also improper because Disney brought the arbitration in an arbitration

15   facility that the parties did not agree to use, which contravenes the CSIC Policy's

16   clear requirement for the dispute to be "submitted to any arbitration facility to

17   which the Insured and Insurer *mutually agree*." *Id.* (emphasis added).

18         In a Friday, October 6, 2017 submission to JAMS, Disney falsely claimed

19   that the parties had agreed to JAMS arbitration.  Myers Decl. Ex. 9.  Disney

20   misrepresented a conditional offer by CSIC to agree to use JAMS' New York office

21   as an arbitration facility if Disney would agree to certain conditions. *Id.*  Disney

22   had rejected CSIC's compromise proposal, and there was not and has never been an

23   agreement between Disney and CSIC to arbitrate.  On Monday, October 9, CSIC

24   wrote to JAMS and explained Disney's dishonest misrepresentation.  Myers Decl.

25   Ex. 11.  On October 13, 2017, JAMS' Los Angeles office confirmed that Disney's

26   Purported Arbitration is improper.  Myers Decl. Ex. 12.  JAMS Los Angeles

27   informed both parties that "JAMS was presented with an agreement that does not

28

8

call for JAMS administration.  Since there is no agreement from the parties to allow JAMS to administer this matter, JAMS cannot proceed with the administration." *Id.*

**CSIC Commences Litigation to Resolve the Parties Dispute**

On October 26, 2017, CSIC filed the *CSIC v. ABC* action in New York County Supreme Court.  *See* Saunders Decl. Ex. C (*CSIC v. ABC* complaint).  The complaint in that action seeks a declaration that CSIC has no obligation to indemnify ABC and Avila for the BPI Settlement.  *Id*. ¶¶ 92-100.  The complaint also seeks to enjoin Disney, ABC, and Avila from continuing with their harassing attempts to initiate improper arbitrations.  *Id*. ¶¶ 110-17.  The New York lawsuit is pending.

## ARGUMENT

The Court should dismiss the petition because it lacks jurisdiction to consider it for multiple reasons.  But even if the Court had jurisdiction to consider the petition, the petition should be denied because it is too late for Disney to elect arbitration under the express terms of the parties' contract.  Furthermore, in the unlikely event that the Court is inclined to order CSIC to participate in an arbitration with Disney, there is no basis to grant Disney's request that CSIC be required to arbitrate at Disney's unilaterally preferred arbitration facility.

## I.   THE COURT LACKS JURISDICTION TO CONSIDER THE PETITION

### A.   Disney Lacks Standing To Bring This Petition

A party cannot require a contractual counterparty to arbitrate with him simply because they are both parties to a contract with an arbitration provision – the parties must also have a dispute that falls within the scope of the arbitration provision.  *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 308-09 (2010) (no obligation to arbitrate dispute "beyond the scope of the [contract's]

9

arbitration clause").  Here, there is no dispute between Disney and CSIC, let alone one that requires arbitration.  Disney was not a party in the BPI Litigation and incurred no liability as a result of that lawsuit.  If CSIC owes money to anyone, it is to ABC and/or Avila (both of whom are absent from this petition to compel arbitration).

It is black letter law that a parent company does not have standing to sue to enforce the contractual rights of its subsidiaries.  *See, e.g., D. Cummins Corp. v. United States Fid. & Guar. Co.*, 201 Cal. Rptr. 3d 585, 590-91, 593 (Cal. Ct. App. 2016) (insured's parent company lacked standing to seek declaratory judgment regarding the duties of its subsidiary's insurers); *New Castle Siding Co., Inc. v. Wolfson*, 468 N.Y.S.2d 20, 21 (N.Y. App. Div. 1983) ("The fact that an individual closely affiliated with a corporation (for example, a principal shareholder, or even a sole shareholder) is incidentally injured by an injury to the corporation does not confer on the injured individual standing to sue on the basis of either that indirect injury or the direct injury to the corporation." (internal citations omitted)).  Accordingly, Disney's petition to compel arbitration should be dismissed.

**B.    ABC and Avila are Necessary and Indispensable Parties, Which Defeats Diversity Jurisdiction**

The FAA does not create any independent federal question jurisdiction, nor does it confer subject matter jurisdiction on federal courts.  Accordingly, "a party seeking to compel arbitration may gain a federal court's assistance only if, "save for" the agreement, the entire, actual "controversy between the parties," as they have framed it, could be litigated in federal court."  *Vaden v. Discover Bank*, 556 U.S. 49, 66 (2009); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581-82 (2008) ("As for jurisdiction over controversies touching arbitration, the Act does nothing, being something of an anomaly in the field of federal-court jurisdiction in bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis." (internal quotation omitted)).

10

Here, the only potential basis for jurisdiction is diversity jurisdiction, which Disney has improperly attempted to manufacture by omitting ABC and Avila as parties even though they are necessary and indispensable parties. *See* Fed. R. Civ. P. 19; *see also Meggitt Orange Cty. Inc. v. Nie*, No. 13-CV-130239, 2014 WL 12588633 (C.D. Cal. July 17, 2014) ("In short, parties are indispensable under Rule 19(b) if they are persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscious."). In evaluating diversity under Section 4 of the FAA, courts should not exercise jurisdiction if "a non-diverse party would be necessary and indispensable to the federal action under Rule 19 of the Federal Rules of Civil Procedure." *Northport Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 486, 486 n.2 (8th Cir. 2010) (collecting cases and citing *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1106 (9th Cir. 2002)).

ABC and Avila are necessary and indispensable parties under Rule 19 because they were the only defendants in the BPI Litigation at the time it settled and, if CSIC owes money to anyone, it is to them. CSIC would suffer significant prejudice from proceeding with resolving the coverage issues in a litigation without ABC and Avila. If CSIC defeats Disney's breach of contract claim, it could later find itself defending a substantially similar lawsuit from Avila or ABC, who might argue that it are not bound by an arbitration proceeding to which it was not a party.[2] Avila and ABC are thus necessary parties under Rule 19(a), as "disposing of the action in [their] absence may . . . leave an existing party subject to a substantial risk

---

[2] Even though Disney and ABC are corporate affiliates today, that was not always the case in the past and may not always be the case in the future. In all events, "Rule 19 speaks to *possible* harm, not only to certain harm." *Aguilar v. Los Angeles Cty.*, 751 F.2d 1089, 1094 (9th Cir. 1985) (emphasis in original).

of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ.
P. 19(a)(1). But joining ABC would destroy jurisdiction, as both ABC and CSIC
are citizens of New York.[3] Because the action cannot "in equity and good
conscience" proceed without these indispensable parties, it should be dismissed.
*Takeda v. Nw. Nat. Life Ins. Co.*, 765 F.2d 815, 821 (9th Cir. 1985) (quoting Fed.
R. Civ. P. 19(b)) (dismissing where non-diverse necessary party could not be
joined).

　　　　The Court's opinion in *Meggitt* is instructive. In that case, a corporate
subsidiary brought a lawsuit even though its corporate parent was the one with the
most direct interest in the claim. The *Meggitt* court found that the corporate parent
was a necessary and indispensable party because, otherwise "[d]efendants are left
with a substantial risk of having to re-litigate an identical suit brought later by [the
corporate parent]." 2014 WL 12588633 at *8. The facts here are analogous, and
the result should be the same. *See also Johnson & Johnson v. Coopervision, Inc*.,
720 F. Supp. 1116, 1126 (D. Del. 1989) ("It is conceivable that the presence here of
[parent], which owns 100% of [subsidiary's] stock, could vicariously protect
[subsidiary's] stake in this dispute. A more prudent solution, however, would be
for the dispute to proceed in a forum where [subsidiary] is present, and capable of
safeguarding its own interests."); *Lang v. Colonial Pipeline Co*., 266 F.Supp. 552,
554 (E.D. Pa. 1967) ("The fact that [a company] is a wholly owned subsidiary of a
party already before the court does not negate its indispensability").

　　　　Dismissal for failure to join a necessary and indispensable party is
particularly appropriate where, as here, "plaintiff would have an adequate remedy if
the action were dismissed for nonjoinder." *See* Fed. R. Civ. P. 19(b). Here,
Disney, ABC, and Avila have a forum in which a petition to compel arbitration can
be decided. Indeed, this arbitrability question is already pending before a New

---

[3] Both ABC and CSIC have their principal places of business in New York, New
York.

York state court in *CSIC v. ABC*, which is a court with jurisdiction over the relevant parties.  Saunders Decl. Ex. C; *see also Takeda*, 765 F.2d at 821.

### C.  Disney Violated The Contractual Waiting Period

The CSIC Policy requires that the parties wait "at least 60 days after the date the Mediation shall be deemed concluded or terminated" prior to "commenc[ing] a judicial proceeding."  Myers Decl. Ex. 1 at § XIX.  Mediation terminated on September 1, 2017.  *See* Myers Decl. Ex. 6.  Thus, Disney commenced this judicial proceeding prior to 60 days following the conclusion of mediation, which date would be October 31, 2017.

## II.  EVEN IF THE COURT COULD CONSIDER THE PETITION, THE PARTIES' DISPUTE IS NOT SUBJECT TO ARBITRATION

Even assuming, *arguendo*, that Disney has standing to seek to arbitrate with CSIC and that the Court has jurisdiction to hear Disney's petition, the Court should nevertheless reject Disney's petition based on the clear contractual language prohibiting arbitration in these circumstances.

### A.  The Contract Does Not Allow Disney to Elect Arbitration After Mediation Already Commenced

Even where a valid agreement to arbitrate exists, the Court must determine whether the dispute submitted to it falls within the agreement's terms.  *Stern v. Cingular Wireless Corp.*, 453 F. Supp. 2d 1138, 1143 (C.D. Cal. 2006).  Disney cannot and does not dispute that CSIC did not agree to arbitrate disputes in which mediation had already commenced.  Instead, Disney argues against a strawman by arguing that the sending of a letter commencing mediation does not actually commence mediation.  Disney Br. at 5.  Disney's argument is purely academic because, in this case, the parties actually spent several months participating in multiple mediation sessions.  *See* Fine Decl. ¶ 7-8.  It was only after mediation commenced and proved unsuccessful that Disney purported to reject CSIC's choice of mediation.  *See* Myers Decl. Ex. 6.

Disney argues in its brief that it rejected mediation in a June 28, 2017 letter. Disney Br. at 5 ("AIG chose mediation through its June 22, 2017 letter, and TWDC promptly rejected that choice in its June 28, 2017 letter."). That is not what Disney's June 28 letter says and is not what happened. The June 28 letter says, "Disney has not determined at this time what ADR process it will elect." Myers Decl. Ex. 4. Following the June 28 letter, Disney accepted mediation and the parties spent the months of July and August actually mediating. *See* Fine Decl. ¶¶ 7-8. Disney did not renounce mediation until September 1, 2017, 71 days after it commenced and after actually mediating across multiple mediation sessions. Myers Decl. Ex. 6.

Disney relies heavily on a Delaware case captioned *Qwest Communications International, Inc. v. National Union Fire Ins. Co. of Pittsburgh* that it contends construes a similar arbitration clause, but *Qwest* supports *CSIC's* position. Disney Br. at 1, 4, 6, 9 (citing 821 A.2d 323 (Del. Ch. 2002)). The *Qwest* court makes clear that an insurer's election of ADR process is valid if the insurer provides the policyholder with "a reasonable opportunity to reject the carriers' choice." 821 A.2d at 329. CSIC did that in its June 22 letter, *see* Myers Decl. Ex. 3, and Disney *did not* reject that choice in its June 28 response letter. *Id.* at Ex. 4. Instead, Disney embraced CSIC's choice by participating in mediation for more than 8 weeks. This is in stark contrast to the facts of *Qwest*, where the policyholder timely rejected the insurers' ADR choice in a letter sent 12 days after the insurers' election. *See* 821 A.2d at 326-27. Here, the first document Disney can point to "rejecting" CSIC's ADR election was sent 71 days after the election was made (and implemented).

Disney also relies on a selective portion of the definition of "Mediation" in the ACE Policy to which the CSIC Policy follows form. Disney Br. at 5. The ACE Policy defines "Mediation" to be mediation under the AAA Commercial Mediation Rules "or such other process as the Insurer may, at its sole option, approve." Myers

Decl. Ex. 1 at § II.X.  The fact that CSIC did not require Disney to mediate following AAA Commercial Mediation Rules does not mean that the parties did not mediate.  While certain of the mediation sessions were direct principal-to-principal communications, others involved communicating through third party intermediaries, who facilitated the August 28 mediation session that ultimately led to the termination of mediation.  *See* Fine Decl. ¶ 8.[4]

Disney's alternate argument that this dispute "should be decided by the arbitration panel once convened," Disney Br. at 6, is not supported by law.  Disney relies on the Ninth Circuit's decision in *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, but that case has no relevance here because, in *Chiron*, the court was "not presented with a disagreement over whether the parties agreed to arbitrate."  207 F.3d 1126, 1128 (9th Cir. 2000).  Furthermore, CSIC's limited agreement to arbitrate only in certain circumstances stands in stark contrast to *Chiron*, where the parties broadly agreed to "arbitrate any dispute, controversy or claim arising out of or relating to the[ir] Agreement."  *Id.*

Unlike *Chiron*, the Court here is presented with a disagreement as to whether the parties agreed to arbitrate the instant dispute.  CSIC simply did not agree to arbitrate disputes in which mediation had already commenced.  Disney's argument that this dispute "should be decided by the arbitration panel once convened" is thus not supported by law.  Disney Br. at 6.  CSIC cannot be compelled to arbitrate a dispute it did not agree to arbitrate.  *See United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").  In addition, Disney already asked its preferred arbitration facility, JAMS Los Angeles, to

---

[4] CSIC does recite the details of the parties' mediation sessions in this brief to avoid being accused by Disney of violating the parties' confidentiality agreement.  *See, e.g.,* Myers Decl. Ex. 10 ("[W]e remind AIG that it is required by law and agreement strictly to observe the confidentiality of matters relating to the [redacted] claim").

resolve the dispute of whether the parties agreed to arbitrate, and JAMS declined to convene a panel because it properly recognized that "there is no agreement from the parties to allow JAMS to administer this matter" and that the parties' agreement "does not call for JAMS administration." Myers Decl. Ex. 12.

### B. The Uncontroverted Record Evidence is that The Parties Mediated Before Disney Elected Arbitration

CSIC has submitted the declaration of an employee with percipient knowledge of the parties' mediation efforts. Fine Decl. On the other hand, Disney submits no evidence in support of its argument that, subsequent to June 22, "neither side has taken any action whatsoever to mediate," Disney Br. at 5, except for a conclusory declaration of the same outside litigation counsel who signed Disney's brief, which states, without any foundation, that "TWDC did not agree to mediation," "a mediation provider was not selected," and "[m]ediation briefs were not submitted or exchanged." Myers Decl. ¶ 8. It is true that the parties mediated without the benefit of a formal mediation protocol or facility, but it is just as true that they did mediate, including by enlisting the aid of intermediaries (and Disney's outside counsel was not involved – or at least had no outward facing role). *See* Fine Decl. ¶¶ 7-8. Furthermore, the Court should not reward Disney's efforts to seek to prevent CSIC from introducing details of their mediation by threatening CSIC with liability if it does not "strictly . . . observe the confidentiality of matters" relating to this claim, *see* Myers Decl. Ex. 10, by blindly accepting Disney's false factual assertions.

### III. EVEN IF ARBITRATION WERE PROPER, THE CORRECT ARBITRATION FACILITY IS ONE IN NEW YORK

Even if CSIC were required to arbitrate with Disney, there is no basis to grant Disney's request that the Court "order AIG to proceed with arbitration at JAMS Los Angeles." Disney Br. at 10. To do so would contravene the mandate for this Court to "rigorously enforce arbitration agreements according to their

terms." *U.S. ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 796 (9th Cir. 2017); *see also Munro v. Univ. of S. California*, No. 16-CV-166191, 2017 WL 1654075, at *2 (C.D. Cal. Mar. 23, 2017) ("[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms.") (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2012)).

The CSIC Policy does not require arbitration at JAMS Los Angeles. The arbitration provision provides for arbitration at an "arbitration facility to which the Insured and the Insurer mutually agree" located in either New York, New York or California. *See* Myers Decl. Ex. 1 at § XIX. Under no scenario is there mutual agreement to proceed using JAMS Los Angeles as an arbitration facility. To the extent the Court requires CSIC to participate in an arbitration, it should be at an arbitration facility in New York, New York (such as JAMS's New York facility) for at least two reasons.

*First*, allowing Disney to unilaterally pick the arbitration facility would negate the express requirement of the contract that the parties "mutually agree" on the facility. The "mutual agree[ment]" language is designed to allow the party who did not elect arbitration to have some control over where the arbitration that they did not elect will proceed. Here, CSIC offered to arbitrate using JAMS New York as the arbitration facility. Myers Decl. Ex. 7 at 2. That was a reasonable offer, and the only reason that there was not mutual agreement is because Disney, ABC, and Avila would not agree. Disney is effectively asking the Court to rewrite the arbitration provision to allow Disney to unilaterally pick the arbitration facility. The Court, of course, is not permitted to rewrite a contract between the parties. *See, e.g., Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557, 560 (9th Cir. 2004) ("It is elementary law, universally accepted, that the courts do not have the power . . . to rewrite contracts which the parties have deliberately made for

17

themselves.") (internal quotation omitted); *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013) ("Arbitration agreements . . . must be placed on equal footing with other contracts.").  Further, courts should "'respect' the umpire selection mechanism in arbitration clauses 'by requiring compliance with those agreements when possible.'" *Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 13-CV-2924, 2013 WL 4482948, at *3 (N.D. Cal. Aug. 19, 2013) (quoting *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 814 F.2d 1324, 1328-29 (9th Cir. 1987) (alteration omitted)).  The Court should thus decline Disney's invitation to rewrite the parties' agreement and instead enforce it as written.

*Second*, to the extent the Court intends to exercise its own judgment about the location of an appropriate arbitration facility, the Court should take into account that the dispute between the parties has absolutely no connection to California other than that California is where Disney's headquarters happened to be at the time it purchased the CSIC Policy.  In contrast, almost all of the facts relevant to the coverage dispute between CSIC and its insureds pertain to the conduct of ABC in New York.  ABC's conduct in New York is what gave rise to the BPI Litigation and is what is specifically at issue in the *CSIC v. ABC* coverage dispute.  Saunders Decl. Ex. C.[5]  Accordingly, most of the relevant witnesses and documents are located in New York, and there is no reason to require every witness and all the lawyers in this case to travel to Los Angeles simply because it is closer to Disney's headquarters.

---

[5]  Portions of the *CSIC v. ABC* complaint were redacted in the publicly filed version because of Disney's contention that CSIC is required to keep certain purportedly non-public information confidential.  If the Court would find it helpful, CSIC would be happy to disclose these redacted portions, which relate to ABC's conduct in New York, to the Court under seal, pursuant to Court order, or with the consent of Disney.

1

## **CONCLUSION**

2      For the foregoing reasons, Disney respectfully requests that the Court dismiss

3  Disney's Petition to Compel Arbitration.

4

5  Dated: October 26, 2017                KASOWITZ BENSON TORRES LLP

6                                         By:   */s/ Daniel A. Saunders*
                                               Daniel A. Saunders (SBN 161051)
7                                              dsaunders@kasowitz.com
                                               2029 Century Park East, Suite 2000
8                                              Los Angeles, CA 90067
                                               Telephone: (424) 288-7900
9                                              Facsimile: (424) 288-7901
10

11                                         OF COUNSEL:

12

13                                             Michael J. Bowe (*pro hac vice* application
                                                  forthcoming)
14                                             Alexander B. Simkin (*pro hac vice*
15                                                application forthcoming)
                                               mbowe@kasowitz.com
16                                             asimkin@kasowitz.com
                                               1633 Broadway
17                                             New York, NY 10019
18                                             Telephone: (212) 506-1700
                                               Facsimile: (212) 506-1800
19

20                                         *Attorneys for Defendant AIG Specialty*
                                           *Insurance Company f/k/a Chartis Specialty*
21                                         *Insurance Company*
22

23

24

25

26

27

28